[No. B232899. Second Dist., Div. Four. Feb. 23, 2012.]

HONG-CHUAN LIN and SHWU-JEN LIN, Plaintiffs and Appellants, v. ING-JIEH JENG et al., Defendants and Respondents.

## COUNSEL

Klika, Parrish & Bigelow and Franklin T. Bigelow, Jr., for Plaintiffs and Appellants.

Mark M. O'Brien and Kevin B. Sawkins for Defendants and Respondents.

## OPINION

**WILLHITE, J.**—This is the second appeal in a partition action brought by plaintiffs Shwu-Jen Lin and her husband, Hong-Chuan Lin, against Shwu-Jen Lin's brother, Ing-Jieh Jeng. As did the parties at trial, we refer to plaintiff Shwu-Jen Lin as "Jane," and to defendant Ing-Jieh Jeng as "Jack." In the complaint, Jane and her husband (collectively, plaintiffs) alleged that they owned an undivided 85 percent interest in a single-family residence in Alhambra, and that Jack owned an undivided 15 percent interest. Plaintiffs sought a partition by sale. The five surviving siblings of Jane and Jack filed a complaint in intervention in the partition action, alleging that each of the siblings (including Jane and Jack) owned a one-seventh interest.[1] Following a bench trial, the trial court entered an interlocutory judgment decreeing that Jack, Jane, and her husband held title to the property as trustees of a resulting trust, and that Jane, Jack, and the other surviving siblings were the beneficiaries of the resulting trust and owned equitable interests in the property as tenants in common.

In the first appeal, plaintiffs challenged the trial court's findings. We affirmed the judgment in *Lin v. Jeng* (No. B211023) (nonpub. opn.), filed January 22, 2010. After we issued our opinion in that appeal, Jack and the intervener/siblings (collectively, respondents) filed a motion for their attorney fees, and plaintiffs moved for their attorney fees. The trial court granted respondents' motion, apportioning the fees among the parties in proportion to their interests in the property, and denied plaintiffs' motion. Plaintiffs now appeal from that order, contending that the trial court improperly applied Code

---

[1] They alleged that Jane and her husband shared a joint one-seventh interest.

of Civil Procedure[2] section 874.040 in denying their motion and in granting respondents' motion in full. We affirm the trial court's order granting and denying the attorney fees motions.

Plaintiffs also challenge the trial court's order setting a trial date in a separate (although related) case filed by Jack, seeking contribution from plaintiffs for amounts Jack paid on the mortgage on the property after trial, before the property was sold. As we explain below, that order is not a proper subject of this appeal because it was made in a different case.

## BACKGROUND

To determine whether the trial court abused its discretion when ruling on the attorney fees motions, it is necessary to consider the facts of the underlying litigation. For that, we rely on the statement of facts from our opinion in the first appeal, much of which we repeat here.

### I. *The Parties*

We begin with the cast of characters. As noted, Jane and Jack had five surviving siblings: a sister, Shwu-Huey Jeng (who was the sole resident of the property at the time of the litigation), and four brothers, Ing-Song Jeng, Ing-Ming Jeng, Ing-Yann Jeng, and Ing-Pei Jeng. At trial, brother Ing-Song Jeng was referred to as "Raymond," and we will use that designation. As necessary, we will refer to the other surviving brothers and the sister individually by their first hyphenated names. One other brother, Ing-Lei Jeng, was deceased at the time of trial. In the record, he is referred to as "Larry," and we will use that designation as well. The parents are also deceased, and their names do not appear in the record. We will refer to them as "the parents."

A bench trial was conducted on Jane's complaint and the siblings' complaint in intervention. Jane, her husband (Hong-Chuan Lin), Jack, Raymond, Shwu-Huey, and certified public accountant Phillip Thong testified at that trial.

### II. *The Purchase of the Rosemead House*

After immigrating to the United States from Taiwan, the parents decided to purchase a house on Brighton Street in Rosemead, California. This house was the predecessor property to the Alhambra property that was the subject of the partition action. Jane, who was a real estate agent, helped in the purchase of

---

[2] Further undesignated statutory references are to the Code of Civil Procedure.

the Rosemead house, which was completed in 1981. The persons who lived in the house were the parents, Jack, Larry, and Shwu-Huey.

According to Jane, the parents did not have credit, and Jack had just arrived from Taiwan. Thus, Jane obtained the loan for the purchase of the Rosemead house. However, because the mother insisted that Jack also be named on the loan, both Jack and Jane signed the loan documents. Also at the parents' request, Jack and Jane took title to the house as tenants in common, each with a 50 percent interest, even though Jane paid no money for the purchase, and never made a loan payment. Soon after the purchase, Jane quitclaimed her interest in the house to Jack, because she did not own the house and had simply arranged the loan.

According to Jack, he made all the mortgage, tax, and insurance payments on the Rosemead house. In late 1982, he married and moved out, but continued to make all the payments.

> III. *Sale of the Rosemead House and Purchase of the Alhambra House*

The parents decided to sell the Rosemead house, and found another house that they wished to buy on Geranio Drive in Alhambra. This is the property that was the subject of the partition action. At the parents' request, Jane arranged the sale of the Rosemead house and the purchase of the Alhambra house, which were completed in January 1984.

The purchase price for the Alhambra house was approximately $113,000. The downpayment was $51,209, comprised of contributions from certain family members, as follows: the mother contributed $30,023 (approximately 59 percent); Jack contributed $16,981 (approximately 33 percent); Shwu-Huey contributed $2,138 (approximately 4 percent); and Jane contributed $2,067 (approximately 4 percent).

The purchase loan was approximately $62,000, at a variable rate of interest. The loan was signed by Jane and her husband, and by Jack and his then wife.

The grant deed for the Alhambra property listed Jane and her husband as owners in joint tenancy of an undivided 85 percent interest, and Jack and his then wife as owners in joint tenancy of a 15 percent interest. Jack later divorced, and his wife quitclaimed to him her interest in the property.

The family members who lived in the house were the parents, Larry (the now deceased brother), and Shwu-Huey (the sister who was the sole resident of the house at the time the partition action was litigated).

In February 1998, the property was refinanced through a loan obtained by Jane and Jack.[3] Approximately $24,000 was paid to retire the original loan. Jane paid Jack around $12,000 (which was 15 percent of the total loan,) and paid Shwu-Huey $16,795 as repayment for a loan Jane had obtained from the mother.

After the refinance, the monthly mortgage payment was $800, which Jane paid to the lender. Jack would write Jane a check each month for $120, 15 percent of the mortgage payment. In addition, as explained below, Jane received "rent" from Shwu-Huey.

### IV. *"Rent" and Other Payments*

According to Jane's trial testimony, beginning in January 1984, the parents, Larry, and Shwu-Huey were to pay rent to Jane for living in the Alhambra house, with the checks written to Jane by Shwu-Huey. Before 1985, there was no formal lease, and Shwu-Huey paid rent in amounts as instructed by Jane. Jane calculated the rent by setting it at around $200 less than the monthly mortgage payment. For the first six months, the monthly rent was $532.68. Thereafter, the rent increased because the variable interest rate on the original purchase money loan increased.

In 1985, Jane (as landlord with husband Hong-Chuan Lin) prepared a written lease, later signed by the parents, Larry, and Shwu-Huey, which called for monthly rent of $579.35 beginning in January 1985. This $579.35 payment continued until January or February 1998, when the property was refinanced, after which Jane reduced the rent to $200 a month. Shwu-Huey paid at that rate until March 2006, and afterward stopped paying, although she continued to live in the house. Shortly before trial, Jane had served her with a 60-day notice to quit.

Jane testified that although she was listed on the grant deed as an 85 percent owner, she was responsible for only one-third of the property tax. The arrangement was that Shwu-Huey would write a check for the property tax, and then Jane would pay Shwu-Huey back. Shwu-Huey would then take a deduction from the rent.

---

[3] Apparently, a prior refinancing occurred, but specifics of that transaction do not appear in the record.

Jane did not consider the payments made by Shwu-Huey to be payments toward the mortgage; she considered them to be rent paid to her. Jane alone took the mortgage interest deduction for tax purposes, and never told any of her brothers that she was collecting rent. Jane did not issue receipts for the payments made to her, and did not keep track of the amounts she was paid by Shwu-Huey.

Shwu-Huey testified that Jane told her that the amounts she was paying were for rent. However, Shwu-Huey never told her parents the payments were rent, because they did not understand United States law.

According to Shwu-Huey, from 1984 through 1998, she paid Jane $579.35 a month (Jane denied that the $579.35 rate began in 1984). Beginning in February 1998, Shwu-Huey paid Jane rent of $200 a month. She stopped making that payment in April 2006.

### V. *The Brothers' Financial Assistance to Shwu-Huey*

Although Jane knew that Shwu-Huey was not employed, she testified that she did not know whether her brothers were contributing money so that Shwu-Huey could make the payments. She later testified that she did know that the brothers were providing some financial assistance to Shwu-Huey, and that she considered her own assistance to be her reduction of the monthly rent to around $200 less than the mortgage payment.

Jack testified that at the mother's request, he set up a joint checking account for himself and Shwu-Huey so that Shwu-Huey could write checks for living expenses and make payments to Jane for the mortgage. In 1984, when the Alhambra house was purchased, the mother asked five of the six brothers (excluding Larry) to contribute at least $100 a month to the account. On average, Jack contributed about $100 a month from 1984 until the father died in 1988. In 1989, the mother asked the five contributing brothers to contribute at least $150 a month. Jack believed that all the brothers did so. Jack continued to contribute to the account until 2006, and believed that his brothers continued their contributions also.

Raymond testified that when the parents bought the Alhambra house, they asked the brothers to contribute money to help them make the mortgage payment. Raymond contributed $120 a month until his father passed away in 1988. Then Jack asked him to increase his payments to $150 a month, which he did until five years ago when he retired. He then resumed contributing $120 a month. Raymond made out the checks to Shwu-Huey, or left them blank for her to fill out. He did not specify what the contributions were to be used for, but understood it was for Shwu-Huey to pay the mortgage and living expenses.

Shwu-Huey testified that five of her brothers (excluding Larry) contributed money to her to pay Jane the mortgage and other expenses. She received $100 to $150 a month from Jack. At some point, she told Jack that she did not have enough money, and he loaned Shwu-Huey $10,000, after which she told him he did not have to contribute anymore. From Raymond, she received $120 a month; from Ing-Ming, she received $250 a month; and from Ing-Yann, she received $200 a month. Ing-Pei would contribute money on special occasions such as the Autumn Festival or New Years.

VI. *Jane's Explanation for Her Claim to an 85 Percent Interest as Specified in the Grant Deed*

In her trial testimony, Jane explained why she and her husband received an 85 percent interest in the grant deed for the Alhambra property, and why Jack (with his then wife) received a 15 percent interest, as follows.

When the Rosemead house was sold, the cash proceeds from the sale were about $50,000, which the mother instructed Jane to divide among the parents, Shwu-Huey, and Jack. But Jack initially refused to use any part of his share of the funds to purchase the Alhambra house. The mother then demanded that he pay an amount equal to 15 percent of the purchase price. Jack contributed that amount, $16,981. For that reason, the parents gave him a 15 percent interest as specified in the grant deed.

The mother also asked Jane to arrange a loan to cover the balance of the purchase price, about $62,000. Jane did so. In exchange for Jane obtaining the loan and for signing it (along with her husband), the mother gave Jane and her husband the remaining 85 percent interest in the house.

Similarly, Jane's husband, Hong-Chuan Lin, testified that in early 1983 or 1984, the parents asked him and Jane for help in obtaining a loan for the purchase of the Alhambra house. They said that in exchange, he and Jane would receive an 85 percent ownership interest.

VII. *The 1998 Document and 2006 Letters Contradicting Jane's Claim to an 85 Percent Interest*

Jane's testimonial claim to an 85 percent interest in the Alhambra property was contradicted by certain written communications to her surviving brothers.

In January or February 1998, in response to inquiries from her brothers as to the distribution of shares in the Alhambra property, Jane prepared a written document in Chinese, which set forth the way the property was to be divided as of 1998. The document stated that (1) four brothers—Larry, Raymond, Ing-Ming, and Ing-Yann—were to share a 48 percent interest; (2) Jane and her husband were to receive a 33 percent interest; (3) Jack was to receive a 15 percent interest; (4) sister Shwu-Huey was to receive a 4 percent interest; and (5) brother Ing-Pei's share was to be determined.

At trial, Jane first testified that these percentages reflected the way her parents told her that the property was to be divided. She then testified that her parents did not tell her that the property was to be divided in this manner, but that these were "the percentage[s] as far as my parents knew." She explained: "When they [were] alive, they know that's their percentage, but they didn't tell me when they passed away, I should distribute it this way." Jane then denied that the document set forth her belief as to how her parents wanted the property divided. Rather, the percentages of ownership listed in the document set forth "what [Jane] was willing to do." But Jane was no longer willing to divide ownership in these percentages.

In a letter to Jack (with copies sent to the other surviving brothers) dated February 4, 2006, Jane wrote that based on the circumstances surrounding the sale of the Rosemead house and purchase of the Alhambra house, Jack received a 15 percent interest in the Alhambra house, and Jane and her husband received a 33 percent interest. Jane wrote that when the Alhambra property was sold, she and her husband would take 33 percent, and would withhold 20 percent long-term capital gain for filing the tax return. At trial, Jane conceded that in this letter, she was stating that she and her husband owned only one-third (33 percent), not 85 percent, of the Alhambra house.

In March 2006, Jane wrote a letter to her surviving brothers in which she stated that each of her brothers was entitled to 10.4 percent of the property, for a total of 52.5 percent, and that Jack was entitled to 15 percent.

In February 2006, Jane also wrote a letter to Raymond (with a copy to Jack) in which she stated that she decided to claim an 85 percent interest in the property when she learned that Jack wanted to sue her and had told Shwu-Huey not to pay the $200 rent. At trial, Jane testified that she changed her mind about how the property should be divided after gathering all the

cancelled checks, bank statements, and tax returns showing how much she had paid over the years in relation to the property. She also testified that her parents wanted the property to pass only to her and Jack, and did not want the other siblings to have a share.

### VIII. *Jack and Raymond's Testimony Concerning Ownership of the Alhambra Property*

Jack testified that he believed he owned a percentage of the Alhambra property, but he did not know how much. He did not see the grant deed giving him a 15 percent interest until the 1998 refinancing of the property.

He conceded that his parents never told him that they wanted his brothers or Shwu-Huey to have an ownership interest in the property. However, in December 1995, when his mother knew she was dying, she gave him a diamond ring and asked him to keep the house for Larry (who was then alive) and Shwu-Huey.

Raymond testified that his parents never told him that he would receive an interest in the Alhambra house. He considered his contributions not as an investment, but as helping provide his parents with a decent place to live. According to Raymond, his parents would be "shock[ed] to find out they [were] living in the place renting from" Jane and her husband. They believed that they were living in their own house. He "implore[d] the court to . . . protect my parent's estate from . . . becoming the income property of" Jane and her husband. In his view, the home was the family home left to all the children, and he believed that his parents shared that view.

### IX. *Certified Public Accountant Phillip Thong*

Before trial, by stipulation, the parties agreed to have Phillip Thong, a certified public accountant, prepare an audit report for submission to the court concerning the Alhambra property. The stipulated instructions directed Thong to "[u]se standard, recognized documents, such as cancelled checks, receipts, [check] registers or bank statements to tabulate and calculate payments made by each of the parties . . . for mortgage payments, taxes, and maintenance at" the Alhambra property. Thong was instructed to "[i]gnore all tabulations prepared by the parties" and to consider any sworn declaration of a party "only if it is supported by standard, recognized documents."

Thong prepared an audit report dated March 12, 2008. Only Jane submitted records to Thong; none of the other siblings did so. Based on the information supplied by Jane, Thong calculated that Jane paid mortgage payments of $146,120.08, property taxes of $5,390.03, insurance of $455.22, and maintenance of $54, for a total of $152,019.33.

## X. *Argument and Oral Ruling*

Following the presentation of evidence, counsel for plaintiffs argued that under Evidence Code section 662, the ownership interests reflected in the grant deed—85 percent for Jane and her husband, 15 percent for Jack—were presumed to reflect the full beneficial title, and that this presumption could only be rebutted by clear and convincing evidence. He argued that no such clear and convincing evidence had been presented.

The other siblings—Jack (defendant in the action) and Shwu-Huey, Raymond, and the other surviving brothers (the interveners in the action)—were represented by one attorney. He argued that the presumption of Evidence Code section 662 had been rebutted by Jane's letters in which she claimed less than an 85 percent ownership interest and admitted that her other siblings had varying ownership interests. Moreover, the ownership structure of the Rosemead house (the grant deed showing Jane and Jack as each owning 50 percent of the Rosemead property, although Jane conceded that she did not actually own such an interest) suggested that the family also did not consider the grant deed for the Alhambra house as the final word on ownership. Further, according to counsel, the evidence showed that the parents considered the house theirs.

Counsel also argued that a resulting trust can be created when the purchase price of property is paid by one person, but title is taken in another. Here, according to counsel, the evidence showed that the Alhambra property was purchased with a downpayment supplied by contributions from the mother, Jack, Shwu-Huey, and Jane, but title was taken only in the names of Jane and Jack. Under these circumstances, the court would be justified in finding that a resulting trust was created.

The trial court orally ruled that clear and convincing evidence rebutted the presumption of Evidence Code section 662. The court found Jane and her husband were "inconsistent," "self-serving," "biased," and not entitled to "much credibility." On the other hand, the court found Jack and Raymond "honest" and "truthful" and entitled to "a lot of credibility." The court

announced that it found that Jack and the intervening siblings prevailed over plaintiffs, and that the court was "prepared to make some sort of division of the property at this time." The court's subsequent comments suggest that it was inclined to divide the property, based on each party's percentage contribution to the downpayment for the purchase of the Alhambra residence. However, the court also intended to divide the parents' interest in the residence in some fashion among the seven surviving children, taking into account contributions to the mortgage, and also to refund to Jane certain amounts for property taxes and mortgage payments since 2006. The court ordered both sides to brief the precise manner in which the shares and assets should be calculated.

## XI. *The Interlocutory Judgment*

In its interlocutory judgment filed July 28, 2008, the court declared, in relevant part, that Jane, her husband, and Jack held the Alhambra property as trustees of a resulting trust. The beneficiaries of the trust, and their corresponding equitable interests as tenants in common, were Jane, 15.45 percent; Shwu-Huey, 1.90 percent; Jack, 28.45 percent; Raymond, Ing-Ming, Ing-Yann, and Ing-Pei, each 13.55 percent. The judgment ordered Jane, her husband, and Jack to convey their title to the beneficiaries, and ordered that the property be sold. Upon the sale of the property, plaintiffs were to be reimbursed $22,400 for contributions toward encumbrances on the property, and $5,832 for property taxes, insurance, and maintenance costs. The remaining proceeds were to be distributed to the beneficiaries according to their respective interests.

## XII. *The First Appeal and Postappeal Events*

Plaintiffs appealed from the interlocutory judgment. We affirmed the judgment on January 22, 2010, and awarded costs to respondents. On July 7, 2010, Jack filed a new action against Jane and her husband, seeking contribution for a share of the amounts Jack paid on the mortgage for the preceding two years (i.e., after the trial court entered the interlocutory judgment). The new action (the contribution action), which was a limited jurisdiction case, was assigned case No. 10C01546 (*Jeng v. Lin* (Super. Ct. L.A. County)). In December 2010, Jane and her husband filed an answer to the complaint, as well as notices in both the contribution action and this action (the partition action) asserting that the cases are related. The appellants' appendix in this appeal does not include an order stating that the cases are related, although it does include a minute order from the contribution

action, in which the court to which the contribution action was originally assigned notes that a notice of related cases was filed and sets the matter for a status conference before the court to which the present action is assigned. There is no indication that the two actions were consolidated.

In the meantime, on November 9, 2010, the Alhambra property was sold. The proceeds from the sale, after the lienholder and referee were paid, totaled $387,014.81, and remained deposited in an escrow account awaiting an order of the court regarding how the proceeds would be disbursed.

In late December 2010, respondents filed a motion for attorney fees in the trial court. The motion included a declaration from their attorney, stating that he charged his clients an hourly fee of $325, and that the total amount of fees he charged was $79,626; he attached a copy of the "historical billings" to his clients, which included descriptions of the services he rendered and the amounts owed, but did not include the number of hours spent on those services. The motion asked the court to determine the proportion of those fees that Jane should be ordered to pay, and argued that the court should exercise its discretion to order her to pay 85 percent of the fees charged, based upon her conduct in the litigation.

Plaintiffs opposed respondents' motion, arguing that all of the parties' attorney fees should be apportioned among the parties based upon each party's interest in the property. They also "raise[d] . . . a general objection" to the amount claimed, on the ground that the "historical billings" did not specifically state the number of hours for which the attorney sought compensation.

Plaintiffs also filed their own motion for attorney fees, claiming $106,768.85 in fees, to be apportioned according to each party's interest in the property. Respondents opposed the motion, arguing that the court should exercise its equitable discretion and not require respondents to pay any portion of Jane's attorney fees due to her conduct in trying to deprive her siblings of any interest in the property.

In addition to the attorney fees motion, plaintiffs filed a separate motion for an order allocating and ordering disbursement of the proceeds from the sale of the property. Included with the motion was evidence setting forth the amounts plaintiffs paid after entry of the interlocutory judgment until the property was sold. Respondents opposed the motion, noting that Jack was

also claiming reimbursement for payments he made during that period, under an alleged agreement with Jane, and that his claim is the subject of a separate lawsuit, i.e., the contribution action. Respondents asked that all posttrial payment/contribution matters be resolved in the contribution action.

### XIII. *The Trial Court's Ruling on the Postappeal Motions*

The trial court issued a tentative ruling on the attorney fees motions and the allocation motion. The court granted respondents' motion for fees, finding the requested fees were reasonable, and ordered that the fees be apportioned among the parties in proportion to each party's interest in the property. The court denied the motion for fees brought by plaintiffs, citing "equitable considerations." Finally, the court granted plaintiffs' motion for allocation and ordered that the net proceeds of the sale of the property be distributed to the parties according to their respective ownership interests.

At the hearing on the motions, plaintiffs' counsel argued that, under the relevant statute (i.e., § 874.040), they were entitled to their attorney fees because they were incurred for the common good, since the litigation benefitted all of the parties. In response, the court noted that although the statute provides for attorney fees to be awarded to both sides, it also includes a provision for equitable consideration. The court concluded that the equities in favor of respondents "far outweighed any equity whatsoever for the plaintiff[s]," and found that Jane "manipulated this thing . . . in her favor and not in favor of all the siblings."

Moving on to the motion for allocation, counsel for plaintiffs observed that the issue of posttrial payments made on the property before the sale are addressed both in the motion and in the contribution action Jack filed. The court, which had little information about the contribution action, asked respondents' counsel about it. Counsel explained that the action addresses posttrial payments Jack made, and alleges the payments were made under an agreement between Jack and Jane regarding who would be responsible for them. He asked that the case be set for trial. Plaintiffs' counsel disagreed that the matter should be set for trial, arguing that the court had already determined the appropriate allocation of pretrial payments made on the property and that the posttrial payments should be similarly allocated. He noted that plaintiffs had submitted a declaration showing the amounts they had paid, and all that was necessary was for respondents to submit their own declarations showing the amounts they paid. The court indicated it would set

a trial date for the contribution action and send the parties to mediation to see if the issues could be resolved without a trial.[4]

The court adopted its tentative ruling as the court's order, and ordered counsel for respondents to give notice. The notice of ruling filed by respondents states, among other things, the amount Jane is required to pay to respondents for her portion of their attorney fees ($12,302, which is 15.45 percent of the total fees incurred by respondents) and the total amount respondents are required to pay plaintiffs as their share of the amounts expended by plaintiffs posttrial ($2,681.14, which is 84.55 percent of the total amount plaintiffs expended). Plaintiffs timely filed a notice of appeal from the trial court's order.

## DISCUSSION

Plaintiffs contend on appeal that (1) the trial court improperly applied section 874.040 in refusing to award them any of their attorney fees based upon equitable considerations; (2) the award of attorney fees to respondents was improper because the evidence they presented did not set forth the number of hours the attorney worked; and (3) the trial court erred by setting the contribution action for trial.

### A. Denial of Attorney Fees

Section 874.040 governs the apportionment of costs in a partition action. It provides: "Except as otherwise provided in this article, the court shall apportion the costs of partition among the parties in proportion to their interests or make such other apportionment as may be equitable." Plaintiffs contend that, under this statute, they were entitled to recover their attorney fees because those costs were incurred for the common benefit of the parties (since it resulted in ownership interests for each of the siblings), and the equitable exception in the statute does not apply under the circumstances of this case. In making this contention, plaintiffs rely primarily upon two cases: *Stutz v. Davis* (1981) 122 Cal.App.3d 1 [175 Cal.Rptr. 701] (*Stutz*) (a case decided by this court) and *Finney v. Gomez* (2003) 111 Cal.App.4th 527 [3 Cal.Rptr.3d 604] (*Finney*). We find that *Stutz* is distinguishable, and *Finney* is inconsistent with the current statutory language.

In *Stutz*, the plaintiff in the partition action owned a one-third interest in the property at issue, and the defendant owned a two-thirds interest. (*Stutz, supra*, 122 Cal.App.3d at p. 4.) The property was sold to the plaintiff at

---

[4] The trial court's notice of trial issued in the contribution action is included in the appellants' appendix in this appeal.

private auction, and the plaintiff deposited two-thirds of the sale price into escrow. In awarding attorney fees, the trial court properly found that the plaintiff should bear one-third of the costs and the defendant should bear two-thirds, but it erroneously applied that ratio to the funds in escrow, resulting in the defendant bearing the entire cost of the attorney fees. (*Id.* at p. 5.) In reversing the trial court's order, we explained that "[w]hile we recognize that the applicable statutes allow the trial court to apportion fees and costs in an equitable manner, there is nothing in the record before us to support an apportionment in any manner other than according to the respective interest of the parties in the property." (*Ibid.*) In other words, in *Stutz*—unlike in the present case—there was nothing in the record to indicate that the trial court intended to exercise its discretion to apportion the fees other than according to the parties' interest in the property, nor was there any evidence to support such an allocation. Thus, plaintiffs' reliance on *Stutz* is misplaced.

In *Finney*, the appellate court stated that "[s]ection 874.040 has been consistently interpreted as giving courts only two options in apportioning the costs and fees of a partition action. The court may apportion the fees and costs based on the parties' respective interests in the property, or it may apportion the costs and fees based on some other equitable apportionment." (*Finney, supra*, 111 Cal.App.4th at p. 545.) The court went on to state that the Law Revision Commission comments to section 874.040 set forth the only two circumstances under which a trial court may make an equitable apportionment—where the litigation arises among only some of the parties, or where the interest of the parties in all items, lots, or parcels of property is not identical. (111 Cal.App.4th at pp. 545–546.) We disagree with the *Finney* court's analysis. Although there is case law that supports a limitation on the trial court's ability to make an equitable apportionment, those cases were decided under a different version of the applicable statute.[5]

Section 874.040 was enacted in 1976, and was based upon former section 796. There is a key difference, however, between section 874.040 and former section 796. Former section 796 did not include a general equitable exception to the rule that costs in a partition action must be apportioned among the parties in proportion to their interests in the property. Instead, it set forth a single exception to an otherwise mandatory rule. It provided in relevant part: "The costs of partition, including reasonable counsel fees, expended by the plaintiff or either of the defendants, for the common benefit, fees of referees, and other disbursements, must be paid by the parties respectively entitled to

---

[5] As we discuss, *post*, contrary to the *Finney* court's statement about how section 874.040 "has been consistently interpreted" (*Finney, supra*, 111 Cal.App.4th at p. 545), only two other reported cases have addressed attorney fees in partition actions since 874.040 was enacted, and only one of those even mentions equitable apportionment.

share in the lands divided, in proportion to their respective interests therein, and may be included and specified in the judgment. . . . When, however, litigation arises between some of the parties only, the court may require the expense of such litigation to be paid by the parties thereto, or any of them." (Enacted 1872; amended by Code Amends. 1873–1874, ch. 383, § 101.)

Because there was no general equitable exception in former section 796, challenges to attorney fee awards before that statute was replaced by section 874.040 focused on whether the challenged fees were expended for the common benefit, with parties objecting to awards of fees incurred by parties who contested matters that ultimately were resolved in favor of the objecting parties. In a pair of early cases, the California Supreme Court held that when an action for partition was properly brought, the costs incurred for services rendered for the common benefit must be shared by the parties in proportion to their respective interests "regardless of whether or not there had arisen and been litigated controversies either over the question as to whether or not the parties to the action were cotenants or over the extent of their respective interests as such in the property thus sought to be divided." (*Capuccio v. Caire* (1929) 207 Cal. 200, 208 [277 P. 475] (*Capuccio I*); accord, *Capuccio v. Caire* (1932) 215 Cal. 518, 528 [11 P.2d 1097] (*Capuccio II*).) The court observed, however, that there was an exception to this rule, found in the last sentence of former section 796, which allowed the court to apportion the costs differently when litigation arose between only some of the parties. (*Capuccio II, supra,* 215 Cal. at p. 529.)

■ As noted, there no longer is a single, specified exception to an otherwise mandatory rule. Instead, section 874.040 broadly allows the trial court to "make such other apportionment as may be equitable." Our research has uncovered only three reported cases since section 874.040 was enacted that address the apportionment of attorney fees in a partition action.

In the first, *Forrest v. Elam* (1979) 88 Cal.App.3d 164 [151 Cal.Rptr. 591], the appellate court affirmed the trial court's award of a lesser fee than requested by the plaintiff, finding merit in the trial court's conclusion that some of the attorney's services were expended advancing a meritless contention and therefore were not expended for the common good. (*Id.* at pp. 173–174.) The court did not address the statutory language of section 874.040 that permits the trial court to make an equitable apportionment.

The next case to address the apportionment of attorney fees is *Stutz, supra,* 122 Cal.App.3d 1. As noted, *ante,* the issue in that case was the trial court's erroneous application of the properly apportioned fees to funds belonging solely to the defendant. Although we noted that the statute permitted the trial court to apportion the fees in an equitable manner, we had no need to discuss

whether there were limitations on the court's ability to do so because there was no indication that the court intended to apportion in any manner other than according to each party's interest in the property. (*Id.* at p. 5.)

■ The last case is *Finney, supra,* 111 Cal.App.4th 527, which, as noted, held that the trial court's power to make an apportionment based on equitable considerations was limited by the Law Revision Commission comments to section 874.040. (*Finney,* at pp. 545–546.) We disagree with this conclusion, because it "exalted the Comments over the statutory language. 'Our first and most important responsibility in interpreting statutes is to consider the words employed; in the absence of ambiguity or conflict, the words employed by the Legislature control, and there is no need to search for indicia of legislative intent.' " (*People v. Osorio* (2008) 165 Cal.App.4th 603, 616 [81 Cal.Rptr.3d 167], quoting *People v. Jacobs* (2000) 78 Cal.App.4th 1444, 1450 [93 Cal.Rptr.2d 783]; see also *People v. Robinson* (2010) 47 Cal.4th 1104, 1139 [104 Cal.Rptr.3d 727, 224 P.3d 55] ["official comments of the California Law Revision Commission, while persuasive, are ' "not conclusive[] evidence of [legislative] intent" ' "].)

■ There is no ambiguity in the language of section 874.040. It simply states that the trial court must apportion the costs incurred in a partition action based upon *either* the parties' interests in the property, or equitable considerations. The statute's broad language does not limit the trial court's equitable discretion, and we decline to followFinney by doing so.

Having determined that section 874.040 permits the trial court to apportion attorney fees based upon equitable considerations, we turn to the trial court's determination in this case to hold plaintiffs responsible for all of the attorney fees they incurred. When a trial court makes a ruling based upon equitable considerations, the abuse of discretion standard applies on review of that ruling. (*Hartford Casualty Ins. Co. v. Travelers Indemnity Co.* (2003) 110 Cal.App.4th 710, 724 [2 Cal.Rptr.3d 18].) In other words, the ruling must stand unless plaintiffs establish that the trial court exceeded the bounds of reason, resulting in a miscarriage of justice. (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 566 [86 Cal.Rptr. 65, 468 P.2d 193].) We find no abuse of discretion here.

■ The trial court found that Jane used her experience in real estate to control title to the property in order to prevent her siblings from obtaining their interests, despite their mother's desire that all of the siblings share in the property. In the previous appeal, we concluded that ample evidence supported the trial court's finding that, contrary to plaintiffs' claim to an 85 percent beneficial ownership interest in the property based upon the grant deed, Jane was well aware that she was not entitled to an 85 percent share and that all of

the siblings owned interests in varying amounts. Moreover, as respondents' counsel pointed out in opposition to plaintiffs' attorney fee motion (a point expressly adopted by the trial court), even though Jane knew that all of the siblings shared in the property, she failed to name them in the complaint, thus requiring them to file a complaint in intervention. In light of these facts, we cannot say the trial court exceeded the bounds of reason in finding that an apportionment of plaintiffs' attorney fees that placed the entire liability on plaintiffs was equitable.

### B. *Award of Respondents' Attorney Fees*

Plaintiffs contend the trial court abused its discretion in awarding all of the attorney fees respondents requested, arguing that the requested fees were not based upon hourly billings but were instead "approximations" because the bills submitted in support of the attorney fee motion did not indicate how many hours were spent on the various tasks. Plaintiffs assert that the trial court's decision to award all of the requested fees therefore must have been based upon "equitable considerations" rather than the evidence respondents submitted, which plaintiffs contend was improper. We disagree.

■ Plaintiffs are correct that ordinarily a claim for attorney fees should be supported by evidence of the work performed, the hours worked, and the hourly rate charged. (Citing *Serrano v. Priest* (1977) 20 Cal.3d 25 [141 Cal.Rptr. 315, 569 P.2d 1303].) They are similarly correct that the evidence respondents submitted in support of their attorney fee motion did not expressly state the number of hours worked on each task, although they acknowledge that one can determine the number of hours by dividing the amount charged by the attorney's hourly rate. Where their argument fails, however, is in its assertion that the bills respondents submitted were merely "approximations" of their attorney fees. To the contrary, respondents' counsel declared, under penalty of perjury, that the bills attached to the motion were correct copies of the bills he sent to his clients, which accurately stated the nature of the services he rendered in this case.

■ The fact that some of the entries on the bills show an amount charged that, when divided by the stated hourly rate, results in fractions of hours that seem unlikely[6] is irrelevant. As long as the amount charged does not exceed an amount deemed to be reasonable—i.e., a reasonable number of hours multiplied by a reasonable hourly rate for the kind of work performed—the trial court does not abuse its discretion in awarding the charged amount. Plaintiffs made no attempt in the trial court, and make no attempt here, to demonstrate that any amount sought was unreasonable. Therefore, they have

---

[6] As plaintiffs note, one entry, for $440, represents 1.3538461 hours.

failed to meet their burden to show an abuse of discretion. (*Denham v. Superior Court, supra*, 2 Cal.3d at p. 566 [" 'The burden is on the party complaining to establish an abuse of discretion, and unless a clear case of abuse is shown and unless there has been a miscarriage of justice a reviewing court will not substitute its opinion and thereby divest the trial court of its discretionary power.' "].)

As our Supreme Court has repeatedly observed, " '[t]he "experienced trial judge is the best judge of the value of professional services rendered in his court, and while his judgment is of course subject to review, it will not be disturbed unless the appellate court is convinced that it is clearly wrong['] "— meaning that it abused its discretion." (*PLCM Group, Inc. v. Drexler* (2000) 22 Cal.4th 1084, 1095 [95 Cal.Rptr.2d 198, 997 P.2d 511].) The trial court in this case found that the amount of attorney fees requested by respondents was reasonable. We have no basis to disturb that judgment.

## C. *Setting Trial in Contribution Action*

Plaintiffs' final contention in this appeal concerns Jack's efforts to recover a portion of the amounts he expended on the property after the interlocutory judgment was issued, by means of a separate action, i.e., the contribution action. Plaintiffs argue that those amounts should have been determined and allocated by the trial court as costs of partition in the partition action, and therefore the trial court erred by setting the matter for trial in the contribution action. We have no jurisdiction to review this asserted error.

The appellants' appendix in this case includes a single notice of appeal, in case No. GC037200, i.e., the partition action. The order about which plaintiffs complain, however, was entered in the contribution action. While the two actions may have been deemed related,[7] they remain separate actions because they have not been consolidated. Therefore, to the extent plaintiffs intended to challenge the order setting the contribution action for trial (we express no opinion as to whether such an order is appealable), they were required to file a separate notice of appeal in the contribution action. Without such a notice, timely filed, we have no jurisdiction to review the order. (*Hollister Convalescent Hosp., Inc. v. Rico* (1975) 15 Cal.3d 660, 666 [125 Cal.Rptr. 757, 542 P.2d 1349] [timely filed notice of appeal is required to vest jurisdiction in the appellate court].) If, after trial in the consolidation action, the trial court enters a judgment determining and allocating the posttrial costs Jack incurred, plaintiffs may raise their objections in an appeal from that judgment. We have no jurisdiction to decide them in this appeal.

---

[7] As we have noted, the record does not include an order relating the two cases, although the trial court is proceeding as if they have been ordered related.

## DISPOSITION

The trial court's order granting respondents' motion for attorney fees, denying plaintiffs' motion for attorney fees, and granting plaintiffs' allocation motion is affirmed. Respondents shall recover their costs on appeal.

Epstein, P. J., and Suzukawa, J., concurred.