[No. G036221. Fourth Dist., Div. Three. July 30, 2008.]

THE PEOPLE, Plaintiff and Respondent, v.
EDGAR OMAR OSORIO, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts II.B.–E.

604

**COUNSEL**

Mark Alan Hart, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, and Jeffrey J. Koch, Deputy Attorney General, for Plaintiff and Respondent.

**OPINION**

**ARONSON, J.**—Defendant Edgar Omar Osorio challenges his conviction for murder, arson, robbery, and burglary. Osorio contends the admission of a victim's out-of-court statements describing her attacker violated his right to confrontation under the Sixth Amendment of the United States Constitution as interpreted by the Supreme Court in *Crawford v. Washington* (2004) 541 U.S. 36 [158 L.Ed.2d 177, 124 S.Ct. 1354] (*Crawford*). He also contends the trial court erred in failing to stay a 10-year gang enhancement because the court stayed the sentence on the underlying offense.

In the published portion of this opinion, we reject Osorio's *Crawford* challenge. The trial court properly admitted the victim's statements to a paramedic and a police officer at the scene because they were nontestimonial. The trial court properly admitted the victim's third description of the attacker as partial impeachment under Evidence Code section 1202 of her earlier descriptions. The trial court correctly instructed the jury to consider the third description as impeachment only, and there is nothing in the record indicating the jury failed to follow that instruction. Finally, in the unpublished portion of this opinion, we conclude the trial court erred in failing to stay the gang enhancement attached to the robbery conviction. Accordingly, we stay the gang enhancement and affirm the judgment as modified.

I

FACTUAL AND PROCEDURAL BACKGROUND

Osorio belonged to the Los Malos gang and in that circle was known by his gang moniker, "Criminal." Sometime around midnight on the evening of October 6, 2000, Osorio entered the Anaheim apartment of Angela King, a 34-year-old civilian traffic officer for the Anaheim Police Department. When King returned home, Osorio shot her and fled.

After the shooting, Osorio rode his bicycle to the home of Andrew Guzzetta, a member or associate of the Los Malos gang. Guzzetta, Jose

Arroyo, a fellow Los Malos member, and his brother Cesar, Joshua Parsons, and others congregated at the home drinking beer and smoking marijuana. When Osorio arrived, he told the group he had just "shot a pig." Osorio explained he had heard there were guns in the apartment and he intended to steal them, but was interrupted when a woman in uniform came home. When the woman attempted to stop Osorio from leaving, he said he "freaked out," shot her, and dragged her back into the apartment.

Osorio showed the group a wallet he had taken, which contained King's police photo identification. Agitated and nervous, Osorio concluded he needed to get rid of the wallet. He put the wallet in a dog dish, poured oil on it, and set it on fire. He then picked up the burned wallet and handed it to Parsons, who agreed to dispose of it for Osorio.[1] The wallet was then buried in a vacant lot behind Guzzetta's house. Osorio told the others he had to go back to the apartment to eliminate his fingerprints, and left on his bicycle carrying a container of flammable liquid and a gym towel.

Around 1:00 a.m., fire broke out in King's unit and another apartment in the same complex rented by 70-year-old Betty Easley. A neighbor ran into Easley's apartment and found Easley standing in the back doorway yelling, "Help me. Help me." Easley clutched her throat and explained a burglar had tried to kill her by strangling her. Easley, covered in blood, was in shock. Her throat had been slashed and she was bleeding from stab wounds in the front and back. Neighbors escorted Easley to a detached unit behind the burning building. When a paramedic arrived at the scene, Easley described her attacker as a "white," bald male, approximately 40 years old.

Sergeant Brian McElhaney of the Anaheim Police Department also spoke with Easley at the scene. McElhaney asked Easley to tell him what happened and to describe her attacker. Easley said she had arrived home, turned on the apartment lights, and a man suddenly stabbed her. Easley described her attacker as "white," balding, in his 40's, wearing a brown shirt, and about the same size as the officer, who stood six feet and weighed 195 pounds. She explained she could not see him clearly because the room was dark. McElhaney asked Easley where the man had gone, and she responded that he fled out the back of the apartment. Paramedics transported Easley to the hospital. She had a slash wound to her neck, multiple stab wounds, a collapsed left lung, soot in her mouth and throat, inhalation injuries, low blood pressure from blood loss, and a blackened eye. Firefighters found King lying on the floor of her burning apartment, with a gunshot wound to her head and burns on both arms. King was transported to a nearby hospital.

---

[1] Guzzetta testified that Parsons, not Osorio, burned the wallet.

Sometime after Osorio left Guzzetta's house on his bicycle, Guzzetta, Jose, Cesar, and Parsons moved up the street to the home of Parsons's friend, Adam Hazlett. There, they drank beer, smoked marijuana, and talked about what had happened. About 25 minutes later, Osorio arrived on his bicycle. Osorio told the group, "I just lit the place up." He explained that he rode back to King's apartment to get rid of evidence, but mistakenly walked into the wrong unit. When Osorio encountered an elderly woman inside the apartment, he stabbed her and slit her throat because he did not want any witnesses. Osorio's forearms were covered in blood, and he had blood stains on his clothes. He recounted how he had shot a woman wearing a police uniform, and explained he set fire to her apartment to eliminate his fingerprints and any other evidence. While talking to the group, Osorio removed a small .22- or .25-caliber pistol from his waistband and wiped blood from it with his shirt. He said, "I've got to get rid of this," and attempted to hand over the gun, but no one would take it.

On October 8, 2000, King died from the gunshot wound. Investigators determined she had been shot at point-blank range. At the autopsy, the pathologist removed a .25-caliber bullet fragment from her brain. On October 10, 2000, Detective Karen Schroepfer interviewed Easley in her hospital room. Unable to speak, Easley wrote on a notepad. In describing her assailant, she noted he had tan skin. Easley remained hospitalized until she died from pneumonia on December 11, 2000.

On October 7, 2000, Parsons retrieved King's buried wallet and contacted police the following day. Parsons told investigators a person known as "Criminal," and matching Osorio's description, had given him the wallet. He also told police that Osorio had described how he had committed the crime. Parsons identified Osorio from a six-pack lineup.

On October 9, 2000, officers placed Osorio's house under surveillance. About 10:30 p.m., a male Hispanic emerged from the residence, walked to the front sidewalk, looked up and down the street several times, and then reentered the residence. He repeated his surveillance six to eight times over a period of five minutes. At 11:30 p.m., the man repeated this exercise, and exited the house 10 minutes later with Osorio. When plainclothes investigators drove by on more than one occasion, Osorio would either turn around or cover his face. Osorio sat behind a tree and then reentered the residence with his companion. Both men reemerged five or 10 minutes later, and Osorio began walking away. When police vehicles converged on the scene, Osorio ran into an alley and jumped over a fence. After a 45-minute to one-hour search assisted by a helicopter and canine unit, police located Osorio crouching between an air conditioning unit and a house. When police arrested Osorio, he exclaimed: "You guys should have killed me."

On October 11, 2000, Timothy Warren, an inmate at an Anaheim police facility, was cleaning cells when Osorio called him over. Osorio asked Warren if he had seen Osorio's picture on television and said, "I am here for that thing in Anaheim." When Warren asked, "What thing in Anaheim?" Osorio responded, "Yes, I did that pig." Osorio asked Warren to bring him a copy of the newspaper and Warren agreed. Warren later identified Osorio from a six-pack lineup.

The jury convicted Osorio of two counts of first degree murder (Pen. Code, § 187, subd. (a));[2] one count of first degree robbery (§§ 211, 212.5, subd. (a)); two counts of first degree burglary (§ 459); one count of arson of a structure causing great bodily injury (§ 451, subd. (a)); and one count of arson of an inhabited structure (§ 451, subd. (b)). The jury found to be true the following special circumstances: murder in the commission of a burglary (§ 190.2, subd. (a)(17)(G)); murder in the commission of a robbery (§ 190.2, subd. (a)(17)(A)); murder in the commission of an arson (§ 190.2, subd. (a)(17)(H)); and multiple murder (§ 190.2, subd. (a)(3)). The jury also found Osorio personally discharged a firearm causing great bodily injury (§ 12022.53, subd. (d)) and twice personally used a deadly weapon (§ 12022, subd. (b)(1)). In a bifurcated trial on gang allegations, the jury found Osorio's burglary and robbery of King to have been committed for the benefit of, or at the direction of, or in association with a street gang.

At the penalty phase, the jury agreed defendant should receive a sentence of life without the possibility of parole. The court sentenced Osorio to two consecutive terms of life without the possibility of parole, plus a consecutive term of 44 years to life. Osorio now appeals.

## II

### DISCUSSION

A. *Admission of the Victim's Pretrial Statements Did Not Violate Osorio's Rights Under the Confrontation Clause*

1. *Osorio Has Not Forfeited His* Crawford *Challenge*

Relying on *Crawford, supra,* 541 U.S. 36, Osorio contends the trial court violated his Sixth Amendment right to confrontation when it admitted Easley's descriptions of her attacker. The Attorney General counters that Osorio forfeited his right to challenge admission of the statements because

---

[2] All statutory references are to the Penal Code unless otherwise noted.

Osorio was directly responsible for Easley's unavailability. The prosecution's failure to raise the issue at trial precludes invoking it on appeal.

■ The Sixth Amendment allows admission of a witness's out-of-court testimonial statements against a criminal defendant if the witness is present at trial for cross-examination. If the witness is unavailable, the testimonial statements are admissible only if the defendant had a prior opportunity to cross-examine. (*Giles v. California* (2008) 554 U.S. ___ [171 L.Ed.2d 488, 128 S.Ct. 2678, 2682–2683] (*Giles*).) The United States Supreme Court has read the clause as referring to the right of confrontation at common law, "admitting only those exceptions established at the time of the founding." (*Crawford, supra*, 541 U.S. at p. 54.) The court has recognized two historical exceptions to the common law right of confrontation: dying declarations and forfeiture by wrongdoing. (*Giles*, at pp. ___–___ [128 S.Ct. at pp. 2682–2683].) Forfeiture by wrongdoing is an equitable doctrine based on the principle that "one who obtains the absence of a witness by wrongdoing forfeits the constitutional right to confrontation." (*Davis v. Washington* (2006) 547 U.S. 813, 833 [165 L.Ed.2d 224, 126 S.Ct. 2266] (*Davis*).)

■ In *Giles*, the Supreme Court recently clarified that the forfeiture by wrongdoing exception applies only where the defendant acted with the intent or purpose of making the witness unavailable to testify at trial. Although the court did not expressly specify any particular procedure or level of proof required for determining whether the doctrine applies, it recognized that where the defendant is on trial for the witness's murder, the trial court must conduct an evidentiary hearing before admitting the witness's statement if the defendant objects to its admission. (*Giles, supra*, 554 U.S. at p. ___, fn. 6 [128 S.Ct. at p. 2691, fn. 6].) At the hearing, the prosecution cannot rely solely on the unavailable witness's unconfronted testimony, but must present independent corroborative evidence supporting the forfeiture finding. The prosecution also must show the unavailable witness's prior statement falls within a recognized hearsay exception and the probative value of the proffered evidence outweighs its prejudicial effect.

Here, the prosecution failed to raise the forfeiture-by-wrongdoing doctrine below. Because the trial court never held an evidentiary hearing or made the required finding that Osorio killed Easley to prevent her from testifying at trial, we do not consider the matter further.

    2. *Easley's Descriptions of Her Attacker at the Scene Were Not Testimonial*

■ In *Crawford*, the United States Supreme Court held that the confrontation clause of the Sixth Amendment bars "admission of testimonial

statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." (*Crawford, supra*, 541 U.S. at pp. 53–54.) *Crawford* did not provide a comprehensive definition of "testimonial," but explained the term "applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." (*Id.* at p. 68.)

In *Davis*, the court established an analytical framework for determining when an unavailable witness's statements are testimonial. There, a 911 caller abruptly ended the call without speaking. The 911 operator returned the call. Upon answering, the victim explained: " 'He's here jumpin' on me again.' " (*Davis, supra*, 547 U.S. at p. 817.) After naming the defendant and briefly describing the assault, the victim informed the operator the defendant had " 'just r[un] out the door' " and was leaving in a car with another person. (*Id.* at p. 818.) The victim started to speak again, but the operator told her to " '[s]top talking and answer my questions.' " (*Ibid.*) The victim complied and provided information about the defendant, including his birthday, and further described the circumstances of the assault.

The court in *Davis* contrasted its case with *Hammon v. State* (Ind. 2005) 829 N.E.2d 444, a companion case which had been consolidated with *Davis*. In *Hammon*, police responded to a domestic disturbance at the home of Hershel and Amy Hammon. (*Davis, supra*, 547 U.S. at p. 819.) The officers found Amy alone on the front porch, appearing " ' "somewhat frightened." ' " (*Ibid.*) Nonetheless, Amy told them " ' "nothing was the matter." ' " (*Ibid.*) The officers encountered Herschel in the kitchen, who admitted an argument with Amy, but claimed it " ' "never became physical." ' " (*Ibid.*) In a subsequent interview, Amy acknowledged Herschel had shoved her to the floor and attacked their daughter. (*Id* at p. 820.)

The Supreme Court determined the statements in the 911 call in *Davis* were nontestimonial, but came to the opposite conclusion regarding the police interview in *Hammon*. The high court explained that in *Davis* the statements were nontestimonial because they (1) pertained to ongoing events; (2) involved an emergency situation; (3) were elicited by the investigating officers to resolve an ongoing emergency situation; and (4) were given in an informal setting. (*Davis, supra*, 547 U.S. at p. 827.) In *Hammon*, the court explained the statements constituted testimonial evidence because they "deliberately recounted, in response to police questioning, how potentially criminal past events began and progressed." (*Id.* at p. 830.) The court reasoned, "Such statements under official interrogation are an obvious substitute for live testimony, because they do precisely *what a witness does* on direct examination; they are inherently testimonial." (*Ibid.*, original italics.)

■  The court summarized the holding for both cases: "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." (*Davis, supra*, 547 U.S. at p. 822.)

■  In *People v. Cage* (2007) 40 Cal.4th 965, 984 [56 Cal.Rptr.3d 789, 155 P.3d 205] (*Cage*), the California Supreme Court analyzed *Davis*, and derived the following basic principles for determining whether a witness's out-of-court statement is testimonial: "First, . . . the confrontation clause is concerned solely with hearsay statements that are testimonial, in that they are out-of-court analogs, in purpose and form, of the testimony given by witnesses at trial. Second, though a statement need not be sworn under oath to be testimonial, it must have occurred under circumstances that imparted, to some degree, the formality and solemnity characteristic of testimony. [Fn. omitted.] Third, the statement must have been given and taken *primarily* for the *purpose* ascribed to testimony—to establish or prove some past fact for possible use in a criminal trial. Fourth, the primary purpose for which a statement was given and taken is to be determined 'objectively,' considering all the circumstances that might reasonably bear on the intent of the participants in the conversation. [Fn. omitted.] Fifth, sufficient formality and solemnity are present when, in a nonemergency situation, one responds to questioning by law enforcement officials, where deliberate falsehoods might be criminal offenses. Sixth, statements elicited by law enforcement officials are not testimonial if the primary purpose in giving and receiving them is to deal with a contemporaneous emergency, rather than to produce evidence about past events for possible use at a criminal trial." (*Ibid.*, original italics.)

At the hearing on Osorio's *Crawford* in limine motion, the paramedic, Christopher Stevens, testified that his fire engine unit responded to a simple burning structure call, and he assisted firefighting efforts when he first arrived on the scene. Receiving a report of an injured person in an apartment at the rear of the burning building, Stevens entered the apartment and saw an injured Easley sitting on a couch. Stevens did not know how Easley had been injured. Attempting to determine the nature of the emergency, Stevens asked Easley what had happened to her. She responded an intruder struck her in the face with an unknown object, and attempted to choke her. Easley described her attacker as a "white," bald male, approximately 40 years old. Stevens did not recall if he asked Easley to provide the description of her attacker. During his physical examination of Easley, Stevens asked her basic information, such as her name, age, and where she felt pain. Stevens described Easley's emotional condition as upset, scared, weak, and distraught.

Applying the principles articulated in *Cage*, Easley's statements to Stevens were nontestimonial. When Stevens contacted Easley, he was unaware a crime had been committed, and he asked her questions to help him medically treat her injuries. Nothing demonstrated Stevens elicited responses to obtain information for later use in a criminal trial, and her statements to him had none of the "formality and solemnity characteristic of testimony." (*Cage, supra*, 40 Cal.4th at p. 984.)

Sergeant McElhaney testified he and other officers arrived at the scene to establish traffic control for the fire department. Shortly after McElhaney arrived, a firefighter informed him there was an "injured party" in the rear apartment. The rear apartment was only 40 or 50 feet from the burning building, and McElhaney described the whole scene as "chaotic." McElhaney encountered Easley sitting on a sofa in the living room. She appeared to be in shock, and had a cut or slashing injury to her neck. At the time, he knew only that Easley had been injured, but did not know an assault had occurred. After asking her what had happened, McElhaney asked Easley to describe her attacker and the direction in which he fled. Easley described her assailant as in his 40's, balding, and possibly wearing a brown shirt, and stated he had fled out the back door. McElhaney immediately broadcasted Easley's description over his radio. He asked no further questions and left the apartment. The entire exchange lasted less than two minutes.

██ As we have recognized in a similar situation: " 'Preliminary questions asked at the scene of a crime shortly after it has occurred do not rise to the level of an "interrogation." Such an unstructured interaction between officer and witness bears no resemblance to a formal or informal police inquiry that is required for a police "interrogation" as that term is used in *Crawford*. [Citations.]' [Citation.]" (*People v. Brenn* (2007) 152 Cal.App.4th 166, 178 [60 Cal.Rptr.3d 830].) ██ McElhaney's questioning of Easley, conducted while she was in a state of shock and bleeding from her wounds, bore none of the earmarks of a police interrogation.

The evidence also demonstrates that McElhaney posed his questions in the midst of an ongoing emergency. Consequently, McElhaney did not perform the type of in-depth interview designed to obtain evidence to secure a conviction at trial; he obtained just enough information from Easley to warn the other officers to be on the lookout for the attacker. McElhaney did not know the attacker's motives, whether he remained in the general area, or carried weapons. Thus, McElhaney did not know whether the attacker posed a threat to the firefighters or officers in the area, or whether he would return to kill Easley.

The Supreme Court in *Davis* recognized this very point, observing that an officer's questions directed toward the identity of the assailant in that case

were necessary, "so that the dispatched officers might know whether they would be encountering a violent felon." (*Davis, supra*, 547 U.S. at p. 827.) We have little difficulty concluding Easley's statements to McElhaney at the scene were nontestimonial.

3. *Easley's Third Description of Her Attacker Was Properly Admitted Under Evidence Code Section 1202*

Easley described her assailant to paramedic Stevens as being a "white," bald male, approximately 40 years old. The trial court admitted this description under the hearsay exception for spontaneous statements. (Evid. Code, § 1240.) Later in the trial, the court permitted the prosecutor to introduce Easley's statement at the hospital that her attacker had tan skin. The trial court admitted Easley's hospital statement under Evidence Code section 1202 for the limited purpose of impeaching that portion of Easley's statement to Stevens describing her assailant as "white."

Osorio presents four arguments to support his claim the trial court erred: (1) Because admission of Easley's previous statements violated his confrontation rights, admission of evidence impeaching those statements also violated the confrontation clause; (2) Evidence Code section 1202 prohibits a party from impeaching its own witness; (3) due process prohibits the prosecution from arguing that a hearsay statement is trustworthy and later impeaching that same statement; and (4) the trial court's limiting instruction to consider Easley's hospital statement only on the issue of her credibility was ineffective because when the prosecution impeached her prior statement that the attacker's skin was white, the jury could only consider this evidence for its truth by concluding the assailant had darker skin. We disagree with each of these arguments.

Osorio's first argument fails because we have concluded the trial court's admission of Easley's descriptions at the scene did not violate the confrontation clause.

Osorio's second argument fails because nothing in the language of Evidence Code section 1202 purports to prevent the proponent of a witness's statement from using a prior inconsistent statement to impeach a portion of that witness's statement. Specifically, Evidence Code section 1202 provides, in relevant part: "Evidence of a statement or other conduct by a declarant that is inconsistent with a statement by such declarant received in evidence as hearsay evidence is not inadmissible for the purpose of attacking the credibility of the declarant though he is not given and has not had an opportunity to explain or to deny such inconsistent statement or other conduct."

We recognize *People v. Beyea* (1974) 38 Cal.App.3d 176 [113 Cal.Rptr. 254] (*Beyea*) held that Evidence Code section 1202 does not allow a

prosecutor to introduce a hearsay statement and then use a prior inconsistent statement to impeach part of the hearsay statement. *Beyea* based its decision on a portion of the California Law Revision Commission comments (Comments), which read: " 'If the hearsay declarant is unavailable as a witness, the party *against whom* the evidence is admitted should not be deprived of both his right to cross-examine and his right to impeach' . . . ." (*Beyea*, at p. 193, original italics.) The court also relied on *Am-Cal Inv. Co. v. Sharlyn Estates, Inc.* (1967) 255 Cal.App.2d 526, 542 [63 Cal.Rptr. 518]), which determined from the Comments that: " 'The purpose of allowing extrajudicial inconsistent statements is to be fair to the party *against whom the hearsay was received inasmuch as he was denied the opportunity of cross-examination;* thus, *such party should at least be allowed to impeach the declarant by admitting the declarant's own statements which are inconsistent with the declaration received in evidence.* [Citation.]' [Citation.]" (*Beyea*, at p. 193.) *Beyea*'s reliance on the Comments to limit the scope of Evidence Code section 1202 is misplaced, for several reasons.

■ First, *Beyea* exalted the Comments over the statutory language. "Our first and most important responsibility in interpreting statutes is to consider the words employed; in the absence of ambiguity or conflict, the words employed by the Legislature control, and there is no need to search for indicia of legislative intent." (*People v. Jacobs* (2000) 78 Cal.App.4th 1444, 1450 [93 Cal.Rptr.2d 783].) There is nothing in the text of Evidence Code section 1202 that gives rise to any ambiguity or lends support to *Beyea*'s interpretation. ■ Indeed, as *Beyea* expressly recognized: "Read literally, the language of Evidence Code section 1202 appears to permit the impeachment of a witness with a prior inconsistent statement by the party who called the witness." (*Beyea, supra*, 38 Cal.App.3d at p. 193.) Because the statute is clear and unambiguous, *Beyea* had no need to resort to the Comments for further clarification.

Moreover, nothing in the Comments suggests the Legislature intended to prevent the use of impeachment evidence by the proponent of the hearsay evidence. The Comments's concern about the party against whom a hearsay statement is offered is understandable given that at the time the Comments were drafted in 1965, a party could not impeach his or her own witness unless the party was surprised and damaged by the witness's testimony. (*People v. Le Beau* (1952) 39 Cal.2d 146, 148 [245 P.2d 302].) Of course, one could never claim surprise or damage arising from his or her own introduction of an out-of-court statement. Accordingly, the question whether a prior inconsistent statement was an appropriate method of impeaching an out-of-court declarant at that point in time was moot.

■ The general rule against impeaching one's own witness, however, was abrogated by the Legislature's passage of Evidence Code section 785 in

the same year it passed Evidence Code section 1202. Evidence Code section 785 provides: "The credibility of a witness may be attacked or supported by any party, including the party calling him." Significantly, Evidence Code sections 785 and 1202 were not only passed in the same year; *they were passed as part of the same bill.* (See Stats. 1965, ch. 299, § 2, p. 1297, operative January 1, 1967.) " 'Both Acts were passed upon the same day and relate to the same subject matter. They are, therefore, according to a well settled rule of interpretation, to be read together, as if parts of the same Act . . . .' [Citation.]" (*People v. McGuire* (1978) 80 Cal.App.3d Supp. 1, 4 [145 Cal.Rptr. 514], citing *People v. Jackson* (1866) 30 Cal. 427, 430; see *Commission on Peace Officer Standards & Training v. Superior Court* (2007) 42 Cal.4th 278, 294 [64 Cal.Rptr.3d 661, 165 P.3d 462] [words of statute to be construed in context].) Under these circumstances, we may safely infer that if the Legislature had intended to make Evidence Code sections 785 and 1202 mutually exclusive, it would have expressly done so. ■ Read together as a single statute, these two sections allow a prosecutor to use a prior inconsistent statement to partially impeach a hearsay statement the prosecutor had previously introduced.

■ As to Osorio's third argument based on due process grounds, we see nothing unfair or inconsistent in the prosecutor's introduction of Easley's first and second descriptions, and use of her third description as partial impeachment. The prosecutor properly introduced Easley's descriptions of her attacker at the scene as excited utterances under Evidence Code section 1240.[3] " 'The foundation for this exception is that if the declarations are made under the immediate influence of the occurrence to which they relate, they are deemed sufficiently trustworthy to be presented to the jury. [Citation.] [¶] The basis for this circumstantial probability of trustworthiness is "that in the stress of nervous excitement the reflective faculties may be stilled and the utterance may become the unreflecting and sincere expression of one's actual impressions and belief." ' [Citation.]" (*People v. Poggi* (1988) 45 Cal.3d 306, 318 [246 Cal.Rptr. 886, 753 P.2d 1082] (*Poggi*).)

Thus, in seeking to introduce Easley's first two descriptions under the spontaneous statement exception, the prosecution sought to demonstrate that Easley spoke under the immediate influence of the attack and therefore provided an " ' "unreflecting and sincere" ' " account of what she perceived. (*Poggi, supra*, 45 Cal.3d at p. 318.) In doing so, the prosecution did not vouch for the complete accuracy of her perceptions, but asserted her statements represented her sincere perceptions and belief. The prosecution did not

---

[3] Evidence Code section 1240 provides, in relevant part: "Evidence of a statement is not made inadmissible by the hearsay rule if the statement: [¶] (a) Purports to narrate, describe, or explain an act, condition, or event perceived by the declarant; and [¶] (b) Was made spontaneously while the declarant was under the stress of excitement caused by such perception."

use Easley's third description to undercut Easley's honesty or sincerity. Rather, the prosecution used Easley's third description to suggest that Easley had difficulty seeing defendant's skin color because the room was dark. The prosecution accordingly invited the jury to disregard entirely Easley's conflicting statements regarding the attacker's skin color, and instead focus on her perceptions regarding his height and weight.

Finally, we reject Osorio's argument that impeachment of Easley's prior identification of her attacker as White necessarily would have caused the jury to consider for its truth that portion of Easley's hospital description that the attacker had tan skin. The trial court specifically admonished the jury to consider Easley's third description only to evaluate the credibility of her previous statements, and not for its truth. In his closing arguments, the prosecutor echoed that admonition, instructing: "The evidence of a tanned complexion cannot be used for the purpose that the person who attacked her actually had a tanned complexion. It can only be used so that it impeaches the prior description. All right? [¶] I know it is a fine line, but you have to walk that fine line, okay?"

In the absence of evidence to the contrary, we presume the jury followed the court's instructions. (*People v. Waidla* (2000) 22 Cal.4th 690, 725 [94 Cal.Rptr.2d 396, 996 P.2d 46].) Because nothing in the record suggests the jury did not follow the court's limiting instruction regarding Easley's third description of her attacker, we reject Osorio's suggestion the jury was unable to consider the evidence as impeachment only.[4]

B.–E.[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

[4] We note in passing that any error in admitting Easley's hospital statement was harmless beyond a reasonable doubt. (*Cage, supra,* 40 Cal.4th at pp. 991–992; *Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824].) Five witnesses testified Osorio bragged about the murders and arson. Although Osorio claimed some of the witnesses lied to hide their own involvement in the crimes, this defense does not explain the testimony given by Warren, an inmate Osorio met while incarcerated at an Anaheim Police Facility. No evidence suggested Warren knew any of Osorio's associates or had spoken with them. Significantly, Warren specifically recalled Osorio referred to King as a "pig," a reference some of the other witnesses testified Osorio used to describe his victim. Moreover, Osorio's actions in hiding his face and fleeing from police demonstrated a consciousness of guilt. In particular, his statement to the police that "You guys should have killed me," belies the defense assertion that Osorio fled because of a previous wrongful arrest.

[*] See footnote, *ante,* page 603.

## III

### DISPOSITION

The judgment is modified by staying the 10-year enhancement for robbery as to count 2. The superior court is directed to prepare an amended abstract of judgment and forward it to the Department of Corrections and Rehabilitation. In all other respects the judgment is affirmed.

Rylaarsdam, Acting P. J., and O'Leary, J., concurred.

Appellant's petition for review by the Supreme Court was denied October 28, 2008, S166478.