Filed 3/4/14  P. v. Benitez CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>CESARIO GARIBAY BENITEZ,<br><br>    Defendant and Appellant. | F064492<br><br>(Fresno Super. Ct. No. F11901572)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  Arlan L. Harrell, Judge.

Audrey R. Chavez, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Julie A. Hokans and John A. Bachman, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

A jury convicted Cesario Garibay Benitez (defendant) of first degree murder (Pen. Code,[1] § 187, subd. (a)) and found true allegations that he personally and intentionally

---

[1] All further statutory references are to the Penal Code unless otherwise stated.

discharged a firearm proximately causing the death of Israel Lopez. (§ 12022.53, subds. (c) & (d).)

The court sentenced defendant to two consecutive 25 years to life terms on the murder conviction and the section 12022.53, subd. (d) enhancement, respectively. The court imposed, then stayed, an additional 20-year term on the section 12022.53, subd. (c) enhancement.

## TRIAL EVIDENCE

On March 7, 2011, multiple people were present at the home of Israel Lopez's brother-in-law, located on K Street in Parlier.[2] Among those present were Geralee Rojas, Israel Lopez, Guadalupe Hernandez, defendant and several others. Defendant and Hernandez had their own beds at the K Street residence, whereas Rojas and Lopez did not live there at the time of the shooting.

### *Testimony of Geralee Rojas*

Sometime after Rojas arrived, she went to sit on a bed. Lopez came into the room, grabbed Rojas's purse and tried to toss it onto the ground. Rojas grabbed her purse from Lopez's hands, and several items fell to the floor. Rojas asked what Lopez was doing and told him not to touch her things. Lopez told Rojas that she was not supposed to be there. A man nicknamed "Chelis" came into the room and asked Rojas if she was alright. Chelis told Lopez to go outside. Lopez left, but returned "a couple minutes" later.

When Lopez returned, he began to tell Rojas she was "pretty," and that she would never know "what a good woman" she "could be." Rojas told Lopez to leave her alone. Lopez grabbed some nearby shells from seeds Rojas had been eating and threw them at her. Again Rojas told Lopez to leave her alone. Lopez laughed and told her she was beautiful when she was mad.

---

[2] We will refer to this location as the "K Street residence."

Several people walked in, having heard the argument. Lopez and two others left the room and went into the kitchen. Rojas began chatting with defendant. Lopez then returned and "started up again" with Rojas. Defendant smirked at Rojas and shook his head, suggesting Rojas should not pay attention to Lopez.

Eventually, "somebody" came in and told Lopez "something" about his wife that made Lopez angry. Then, Lopez told Rojas that she was "probably going to die an old, lonely woman …."[3] Defendant told Lopez to leave Rojas alone, and Lopez told defendant to mind his own business.[4]

At this point, Rojas saw that Lopez was unsteady on his feet and perceived him to be "very intoxicated." Rojas did not recall whether Lopez then left for the kitchen or remained in the vicinity.

Defendant told Rojas not to pay any attention to Lopez. Defendant then stood up and told Rojas he was going to go to bed. Lopez came back into the room, and defendant sat back down. Lopez told Rojas that "his best friend is with his wife now." Lopez said he "has been high for a couple days" and "doesn't know why … he is still standing here breathing."

Defendant eventually repeated that he was going to bed. Lopez approached defendant and leaned forward. Lopez then stepped back, said he was leaving and that everyone could "go to hell," and walked out of the room. Defendant looked at Rojas and

_____

[3] Rojas initially testified that she did not recall what Lopez had said to her. On cross-examination by defense counsel, Rojas testified to the substance of what Lopez had said.

[4] Sheriff's Deputy Hector Palma testified that he interviewed a houseguest nicknamed Chaka. According to Chaka, Lopez also said, " 'So then do you want something with me or what?' " to defendant. Defendant then said, " 'It is better if you left,' " to which Lopez replied, " 'Well, no one is going to tell me when to leave. Even if I don't live here, you can't tell me to go.' " Defendant said that they would tell the owner of the home to have Lopez leave.

smiled.  Rojas shook her head and rolled her eyes.  Rojas asked whether defendant had to go to work the next day.  Rojas did not recall what defendant's response was.  Defendant then said, " 'I'm going to go lay down already,' " and walked to his bed.  Rojas closed a curtain nearby, turned up the radio and began to pick up her things.

### *Testimony of Guadalupe Hernandez*

Guadalupe Hernandez testified that defendant retrieved a gun near the time he got into the argument with Lopez.  Defendant wrapped the gun into a black handkerchief and placed it in his pocket.[5]  Defendant then went outside.

In an interview with law enforcement after the shooting, Hernandez said he heard a gunshot "right after" defendant, Lopez and Gustavo left the house.[6]  At trial, however, Hernandez testified that he did not hear a gunshot because the television was loud.

### *Post Shooting*

That evening, Police Officer Omar Khan was dispatched to the K Street residence on a report that a person was "injured."  Officer Khan was the first officer on scene.  He found Lopez lying on his back in the front yard, unconscious and bleeding.  According to the coroner, Lopez had sustained a gunshot wound to the left side of his head "essentially in the temple area."  Rojas testified that defendant was no longer at the K Street residence when police arrived.

At the hospital, Lopez was "technically brain dead" and placed on life support so his organs could be recovered for transplantation.

A pathologist observed no powder grains deposited around Lopez's bullet wound. The absence of these deposits – known as stippling – indicated Lopez was shot from a

---

[5] Hernandez testified that he "think[s]" it was a handkerchief "or something like that."

[6] One of defendant's roommates, Jose Perez, testified that he heard a gunshot "just as soon as" defendant "went outside."

4.

distance equal to or greater than 18 inches. The pathologist testified that Lopez's wound appeared to be a "distant" gunshot wound, inconsistent with the close proximity inherent in a physical struggle.[7]

Defendant was taken into custody in the driveway of a residence in New London, California. Law enforcement searched defendant's room. A .22-caliber revolver wrapped in a black handkerchief, along with ammunition, was found there.

### Defendant's Interview with Law Enforcement

Law enforcement conducted a recorded interview of defendant, which was played for the jury.

Defendant said he smoked marijuana and methamphetamine the day of the shooting, and that Lopez had smoked marijuana. Defendant said that Lopez twice touched Rojas's breasts. Defendant told him to stop, and Lopez challenged him to a fight. But defendant said his fight with Lopez was not about Rojas. Rather, the fight was about the fact that Lopez did not like defendant very much.

Lopez told defendant he wanted to fight him because he was " 'the toughest one around here.' " Lopez told defendant he would " 'f**k' " him " 'up' " and " 'beat the shit' " out of him. Defendant was "fed up" with Lopez because he had humiliated him "so many times." The two went outside to fight. Lopez's friend, Ramirez, accompanied them outside, and defendant thought they were going to attack him. Defendant came out of the house with a gun because he thought Lopez might kill him.

Defendant said Lopez attacked him first. Defendant felt enraged and lost control as they struggled. He pulled out his gun and shot Lopez. Defendant said it was "[a]nger just at that moment and nothing was planned …."

---

[7] This would tend to contradict defendant's claim that he shot Lopez during a physical struggle. Defendant's version of events, as reflected in his interview with police, is set forth later in this opinion.

*Defendant's Confrontation with "Richard" Before the Shooting*

A man named Jose Perez testified that on the morning of the shooting, defendant got into an argument with an individual named "Richard." Defendant "complained" to Richard because "he had called him out on his mother…." When asked if defendant was upset about Richard being at the residence, Perez testified: "Uh, maybe, maybe, because he was just there eating and because he didn't live there." It appeared as if Richard and defendant were going to fight.

Another man named Jose Padilla also testified regarding defendant's interaction with Richard. Padilla testified that an incident involving "Richard" occurred the day before the shooting.[8] Richard was outside the house, "visiting." Padilla was cooking and asked Richard if he wanted to have something to eat. Richard came inside to eat, and defendant began questioning him about "something that had occurred almost 20 years ago." The "owner"[9] told Richard to leave. Afterwards, defendant had his gun in his pocket, looked through the window, and said he was going to kill Richard and his friend.

Padilla testified that, at some point, defendant showed him a gun that looked like the same gun used to shoot Lopez. Padilla said, " 'Put that away. Don't be so hotheaded. Put it away.' " Defendant placed the gun on Padilla's bed, looked out the window and said, " 'Tell Richard to come over. Tell Richard to come over.' " When defendant left the gun on his bed, Padilla threw it over to defendant's bed and said, " 'Why are you leaving this here, you crazy asshole?' "

During an interview with police, defendant was asked about Richard. Defendant said, " 'Oh, I wanted to get him too .…' " He said that Richard did not like him, and that

---

[8] Padilla and Perez appear to have been referencing the same incident. However, Perez said the incident occurred the morning of the shooting, and Padilla said it occurred the day before.

[9] Presumably, the owner of the residence where the shooting occurred.

they had longstanding "problems," and that they had fought once years before. Defendant denied displaying his gun to Richard or anyone else.

## DISCUSSION

I.     EVIDENCE OF DEFENDANT'S "PROBLEMS" IN "WASHINGTON" AND RETURN TO MEXICO

On appeal, defendant claims that the court erred in admitting impeachment evidence that defendant had, prior to the shooting, experienced "problems" involving a gun and was "returned" to Mexico.  We disagree.

*A.  ADDITIONAL FACTS*

In his interview with police, defendant said he was a policeman in Mexico prior to coming to the United States at age 23.  He said, "I've been over here all my life, since I was 23 years old.  I left all that since I was 23 years old … and I came over here and I haven't gone back.  I haven't been back there."  The interview, including this portion about leaving Mexico and never returning, was offered into evidence by the prosecution.

The prosecution also introduced evidence contradicting defendant's out-of-court claim that he never returned to Mexico.  A portion of the prosecutor's examination of Guadalupe Hernandez is set forth below:

> "[PROSECUTOR]: And you told the detectives that [defendant] told you that he had problems in a casino in Washington [s]tate for having a gun and he was returned to Mexico, correct?
>
> "[HERNANDEZ]: Uh, he had told me that.
>
> "[PROSECUTOR]: And he told you that he didn't know that there were sensors in the casino that alert to the fact that there's a gun, correct?
>
> "[HERNANDEZ]: Yes."[10]

---

[10] The prosecutor also elicited testimony from Detective Palma confirming Hernandez's testimony.

*B. ANALYSIS*

Defendant argues that because he did not testify, it was improper to admit hearsay evidence of a prior offense to attack his credibility.  The Attorney General contends the evidence was admissible under Evidence Code section 1202.  We agree with the Attorney General.

1.  The Evidence is Admissible Under Evidence Code Section 1202

Evidence Code Section 1202 provides, in part:

> "Evidence of a statement or other conduct by a declarant that is inconsistent with a statement by such declarant received in evidence as hearsay evidence is not inadmissible for the purpose of attacking the credibility of the declarant though he is not given and has not had an opportunity to explain or deny such inconsistent statement or other conduct…."[11]

By its plain language, Evidence Code section 1202 contradicts defendant's claim on appeal that the prosecution improperly used hearsay evidence to attack his credibility.

Defendant disputes this conclusion, noting that the prosecution was the proponent of both pieces of evidence (i.e., defendant's statement and the evidence impeaching it).  Defendant argues this fact is relevant under *People v. Fritz* (2007) 153 Cal.App.4th 949, 956 (*Fritz*).  In *Fritz*, the Court of Appeal held that when the prosecution offers the defendant's hearsay statement into evidence, it has "no right to impeach it."  (*Ibid.*)

Another appellate case contradicts that portion of *Fritz*.  In *People v. Osorio* (2008) 165 Cal.App.4th 603, 617 (*Osorio*), the Court of Appeal held that Evidence Code sections 785 and 1202 "allow a prosecutor to use a prior inconsistent statement to partially impeach a hearsay statement the prosecutor had previously introduced." (*Osorio*, *supra*, at p. 617.)  On this issue, *Osorio* and *Fritz* seem to conflict.

---

[11] This statute applies when the defendant is the nontestifying hearsay declarant. (See *People v. Jacobs* (2000) 78 Cal.App.4th 1444, 1449-1453.)

We conclude *Osorio* is controlling on this point. The Supreme Court has quoted the relevant *Osorio* language favorably, and has noted that *Osorio*'s "result was … correct." (*People v. Blacksher* (2011) 52 Cal.4th 769, 808.) Therefore, we too hold that a prosecutor may "use a prior inconsistent statement to partially impeach a hearsay statement the prosecutor had previously introduced." (*Osorio*, *supra*, 165 Cal.App.4th at p. 617; *Blacksher*, *supra*, 52 Cal.4th at p. 808.)

Moreover, we note that cases like *People v. Mayfield* (1997) 14 Cal.4th 668 prohibit eliciting irrelevant testimony on cross-examination *merely* for the purpose of contradicting it. (*Id.* at p. 748.) But here, the evidence being impeached was defendant's statement to law enforcement. The prosecution did not offer defendant's statement to law enforcement "merely" to contradict it. The statement contained highly relevant evidence including defendant's admission that he shot Lopez.

As a result, the plain language of Evidence Code section 1202 provides a clear answer to the question we face. The evidence of defendant's prior inconsistent hearsay statement "is not inadmissible for the purpose of attacking [his] credibility" (Evid. Code, § 1202) even though his choice not to testify left him without an opportunity to explain or deny the inconsistent statement. (*Ibid.*) We therefore reject defendant's contention that the evidence was inadmissible because he "was not a witness and did not testify."

2. The Probative Value of the Evidence was not Substantially Outweighed by its Prejudicial Effect

Defendant argues the evidence was inadmissible for another reason: its probative value was substantially outweighed by its prejudicial effect. (See Evid. Code, § 352.) Specifically, defendant contends that the evidence of his "problems" in Washington was not relevant and was highly prejudicial.

a. The Law

"[C]ollateral matters are admissible for impeachment purposes .…" (*People v. Lavergne* (1971) 4 Cal.3d 735, 742.) However, the collateral character of the evidence

9.

reduces its probative value. (*Ibid*.) Therefore, trial courts must determine whether the probative value of the evidence is substantially outweighed by the probability its admission will necessitate undue consumption of time or create substantial danger of undue prejudice, of confusing the issue, or of misleading the jury. (Evid. Code, § 352.) This determination is left to the discretion of the trial court. (*People v. Mayfield*, *supra*, 14 Cal.4th at p. 748 ["the trial court has discretion to admit or exclude evidence offered for impeachment on a collateral matter"].)

"As with all relevant evidence … the trial court retains discretion to admit or exclude evidence offered for impeachment. [Citations.] A trial court's exercise of discretion in admitting or excluding evidence is reviewable for abuse [citation] and will not be disturbed except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice [citation]." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9-10.) " '[T]he discretion to be exercised is that of the trial court, not that of the reviewing court. Thus, even if the reviewing court might have ruled otherwise in the first instance, the trial court's order will yet not be reversed unless, as a matter of law, it is not supported by the record.' [Citation.]" (*People v. Tuggles* (2009) 179 Cal.App.4th 339, 361.)

Under this deferential standard of review, appellate courts have upheld admission of evidence regarding "collateral fact[s]" that "had no bearing on any issue in the trial .…" (E.g., *People v. Morrison* (2011) 199 Cal.App.4th 158, 165.)

### b. Discussion

Here, defendant argues his "residency status was not relevant to any issue in the case[]" including his credibility, citing *Hernandez v. Paicius* (2003) 109 Cal.App.4th 452[12] (*Hernandez*). We disagree.

---

[12] Disapproved on another point by *People v. Freeman* (2010) 47 Cal.4th 993, 1006, fn. 4.

10.

The evidence in question was relevant to defendant's credibility. For this reason, *Hernandez* is inapposite. In *Hernandez*, the Court of Appeal held that evidence of a civil plaintiff's residency status should have been excluded because it was not relevant to the issues at trial. (*Hernandez*, *supra*, 109 Cal.App.4th at p. 460.) Conversely, the evidence here that defendant "was returned to Mexico" *was* relevant to his credibility because it contradicted his claim that he had not "been back" to Mexico since he was 23. (Evid. Code, § 780, subd. (e).)

Defendant contends that even if the evidence is relevant, it was too prejudicial. Defendant largely ignores the court's efforts to minimize any prejudice. The court proposed to the parties the possibility of permitting testimony that defendant had been "returned to Mexico" without reference to defendant's "immigration status" or "deportation." The testimony ultimately conformed to these guidelines. In sum, the court took the proper approach in admitting this relevant evidence while taking steps to mitigate any prejudicial effect. We cannot say the court's decisions were "arbitrary, capricious, or patently absurd," (see *People v. Rodriguez*, *supra*, 20 Cal.4th at pp. 9-10) and therefore find no prejudicial error.

### 3. Any Error Was Harmless

Moreover, we conclude the admission of the impeachment evidence, even if it had been error, was harmless under *People v. Watson* (1956) 46 Cal.2d 818.

At trial, it was undisputed that defendant had shot Lopez. Defendant's credibility was therefore only relevant as to the facts surrounding a potential self-defense theory. On this point, the prosecution's evidence contradicting defendant's version of events was overwhelming.

Defendant claimed he and Lopez "struggled and that's when [he] pulled out the … gun …." Defendant said he and Lopez were stuck together when he fired. But the pathologist testified that the physical evidence (i.e., lack of stippling) showed Lopez had

11.

been shot from a distance inconsistent with the close proximity inherent in a physical struggle.

Moreover, much of defendant's own description of his state of mind comports with killing out of anger rather than self-defense. In the transcript of defendant's statement given to the jury,[13] the following exchange occurred:

> "[DETECTIVE:] But look you already have a gun, you stay in the house and if he doesn't do anything to you inside the house, you would still be cool and calm.

> "[DEFENDANT:] Yeah, I know officer, I know. But when you're enraged … hey.

> "[DETECTIVE:] You lost control.

> "[DEFENDANT:] Yes, I lost control."

Elsewhere, defendant described the shooting as an "outburst" and "[a]nger just at that moment … nothing was planned …." Defendant said Lopez had it coming because defendant was "fed up with him," and Lopez had humiliated defendant so many times. Defendant admitted what he had done "wasn't right," but that he "couldn't take it anymore …."

We conclude any error in admitting the impeachment evidence was harmless.[14]

---

[13] The parties stipulated that the court reporter need not report the audio as played for the jury because "the jurors ha[d] each been provided with a copy of the transcript and the transcript [was] made a part of the record in this case[.]"

[14] Defendant also contends the evidence that his prior arrest involved possession of a gun was unduly prejudicial because it painted him as a "gun-tot[er]." We conclude that any error in this regard was not prejudicial. The vague evidence of defendant's prior "problem" involving a gun was not the only evidence that defendant was a "gun-toter." Indeed, far more direct evidence was offered on the issue. Hernandez testified that defendant "always carried his gun." No objection was made to this testimony. Thus, even if the court had excluded evidence that defendant's prior arrest involved possession of a gun, the jury would still have been exposed to evidence that defendant routinely carried a gun. We therefore find no prejudice resulting from the admission of evidence that defendant's prior arrest involved gun possession.

## II. EVIDENCE OF DEFENDANT'S DISPUTE WITH RICHARD

Defendant claims the court erred in admitting evidence of his interactions with "Richard" that occurred before the shooting. The Attorney General counters that the evidence was properly admitted as evidence of intent and the absence of self-defense.

"Evidence of other crimes is admissible only if relevant to prove a material fact at issue, separate from criminal propensity. [Citation.]" (*People v. Demetrulias* (2006) 39 Cal.4th 1, 14.) Intent and lack of justification (e.g., absence of self-defense) are two examples of "ultimate facts" separate from criminal propensity. (See *ibid*.)

Here, the evidence of defendant's conduct concerning Richard was probative of intent and lack of justification in the shooting of Lopez. At trial, defendant did not dispute that he had shot Lopez. Rather defendant's theory at trial was self-defense. Defendant's statement to police supported this theory. In the statement, defendant admitted to routinely carrying his gun, but claimed he did so for protection. The evidence regarding the dispute with Richard undermined defendant's claim. The testimony indicated that defendant, with his gun in his pocket, said he was going to kill Richard and his friend. There was also testimony that defendant placed the gun on Padilla's bed and asked him to tell Richard to come over. If believed, the evidence suggests that defendant did not carry a gun solely for his "protection." Thus, the evidence of defendant's dispute with Richard was relevant to a material issue apart from criminal propensity. The court did not abuse its discretion in admitting the evidence.

Defendant also claims the court had a sua sponte duty to instruct on the limited admissibility of this evidence. However, courts generally do not have a sua sponte duty to issue such an instruction. (See *People v. Collie* (1981) 30 Cal.3d 43, 63-64.) The *Collie* court acknowledged there "may" be an "occasional extraordinary case" in which a sua sponte duty would arise, such as when the evidence of the prior offense is "dominant … highly prejudicial and minimally relevant to any legitimate purpose…." (*Id*. at p. 64.) This is not such a case. The evidence of defendant's interaction with Richard was not the

13.

"dominant" piece of evidence, nor was it "minimally relevant." Therefore, the court had no sua sponte duty to give the instruction.

III.    LACK OF INSTRUCTION ON DEFENSE OF ANOTHER/HABITATION

A. *THE PARTIES' CONTENTIONS*

Defendant next claims the court erred in failing to instruct on defense of another and defense of habitation. We conclude that neither instruction would have been supported by substantial evidence.[15] Therefore, the court did not err in failing to give the instruction sua sponte.

B. *ANALYSIS*

There is no sua sponte duty to instruct on lesser included offenses unless there is substantial evidence defendant is guilty only of the lesser offense. (See *People v. Prince*, *supra*, 40 Cal.4th at p. 1265.) Similarly, a court need not instruct on a defense that is not supported by substantial evidence. (See *People v. Quintero*, *supra*, 135 Cal.App.4th at p. 1165.)

---

[15] Defendant claims the court erred in failing to instruct on a lesser included offense ("defense of another as a form of imperfect self defense") *and* defenses to the crime ("defense of another … as an alternate form of exculpatory self defense" and defense of habitation). We acknowledge that there are differences between a court's sua sponte duty to instruct on lesser included offenses versus defenses. (*People v. Barton* (1995) 12 Cal.4th 186, 195.) "[A] trial court's duty to instruct, sua sponte, or on its own initiative, on particular defenses is more limited" than its duty to instruct on lesser included offenses. (*Ibid.*) But there is one commonality that spans both contexts: there is no sua sponte duty to give an instruction that is not supported by substantial evidence. (See *People v. Prince* (2007) 40 Cal.4th 1179, 1265 [lesser included offense]; *People v. Quintero* (2006) 135 Cal.App.4th 1152, 1165 [defense].) Because we conclude that neither instruction would have been supported by substantial evidence, the distinctions between sua sponte instructional duties in the context of defenses and lesser included offenses are irrelevant to our holding.

1. The Court had No Sua Sponte Duty to Instruct on Defense of Others Because There was No Substantial Evidence Defendant "Actually" Feared Imminent Harm Would Befall Rojas

Imperfect defense of others applies where the defendant kills "in the actual but unreasonable belief he must defend another from imminent danger of death or great bodily injury …." (*People v. Randle* (2005) 35 Cal.4th 987, 997, overruled on another ground by *People v. Chun* (2009) 45 Cal.4th 1172.) Perfect defense of others applies whether the defendant kills in the actual, *reasonable* belief he must defend another from imminent danger of death of great bodily injury. The difference between the two defenses is the reasonableness of defendant's actual belief in the need to defend another. But both defenses require defendant possess an "actual" fear of imminent harm. (*People v. Butler* (2009) 46 Cal.4th 847, 868.) Here, the court was not required to instruct on defense of another (perfect or imperfect) because there was no evidence defendant *actually* believed he needed to defend Rojas from imminent danger or death.

The last time Lopez was near Rojas, he told everyone to "go to hell," and that he was leaving. Defendant looked at Rojas and smiled. Rojas shook her head and rolled her eyes. Defendant and Rojas then had a brief, casual conversation about whether defendant was going to work. Defendant then said he was going to sleep. Thus the evidence of defendant's conduct during and immediately after the confrontation with Lopez does not show an actual fear of Lopez imminently harming Rojas. And, in his interview with law enforcement, defendant specifically said his fight with Lopez was not about Rojas. There was no substantial evidence to support instruction on defense of others.

2. The Court Did not Prejudicially Err in Failing to Instruct on Defense of Habitation

Defendant's claim the court was required to instruct on defense of habitation also fails. Defendant claims "had the jury been instructed that a person is privileged to use reasonable force to defend his home and persons therein, it is reasonably probable that the jury would have acquitted" him. But deadly force is never reasonable to protect

15.

property alone. (*People v. Curtis* (1994) 30 Cal.App.4th 1337, 1360.) "The defendant must also show either self-defense or defense of others .…" (*Ibid*.) And, as we explained above, there was no evidence to support defense of others. Thus, a defense of others theory could not support an instruction on defense of habitation.

There was some evidence defendant acted in *self*-defense, such as his statement to police.[16] But, the jury was instructed on the theory of self-defense and rejected it. Thus, the failure to instruct on defense of habitation based a self-defense theory, even if erroneous, was not prejudicial because the jury necessarily rejected one of its factual predicates.

IV.    DEFENDANT HAS NOT CARRIED HIS BURDEN IN SHOWING
       INEFFECTIVE ASSISTANCE OF COUNSEL

A. *DEFENDANT'S CLAIM*

Finally, defendant claims trial counsel was ineffective for (1) failing to exclude his statement "suggesting he had killed someone in Mexico"; (2) failing to request "complete" defense instructions; and (3) failing to request limiting instructions as to "other acts and offenses."

B. *ANALYSIS*

"On direct appeal, a conviction will be reversed *only* if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no

---

**16** We disagree with the Attorney General's assertion that "there was *no* evidence that indicated … that appellant acted in the belief there was imminent danger to himself .…" (Italics added.) In his interview with law enforcement, defendant claimed Lopez attacked him first by lunging at him and hitting him. While the jury may not have accepted defendant's testimony, it was evidence nonetheless.

satisfactory explanation." (*People v. Mai* (2013) 57 Cal.4th 986, 1009, italics added.) None of defendant's ineffective assistance claims clear this high hurdle.

Defendant claims counsel should have moved to exclude a portion of his interview with law enforcement. In the interview, defendant said he had been a police officer in Mexico for three years before coming to the United States at age 23. Later in the interview, defendant was asked if he was ever involved in combat involving weapons and he replied, not in the United States, but he had been in Mexico. Defendant was asked whether he killed anyone in Mexico and he twice replied, "[N]o." Defendant said he wanted to "move on" from the subject and told the interviewer that he was "not going to tell" him about "that."

Thus, defendant expressly denied killing anyone in Mexico. Defendant may have created some ambiguity when he said he was "not going to tell" the interviewer about "that." But, trial counsel could have concluded that this weak, ambiguous evidence of a prior violent incident provided a more favorable explanation for why defendant always carried a gun (i.e., he had been involved in violent incidents in the past and now carried a gun for defensive, not offensive, purposes). Or, trial counsel could have believed that the jury might conclude any prior incident occurred while defendant was in the line of duty as a law enforcement officer. In sum, defendant has failed to show that "there simply could be no satisfactory explanation" for counsel to choose not to move to exclude the evidence. (*People v. Mai*, *supra*, 57 Cal.4th at p 1009.)

Defendant also claims trial counsel was ineffective for failing to request instructions on defense of habitation and defense of others. But, as we concluded there, the instruction on defense of others would not have been supported by substantial evidence. Because defendant was not entitled to those instructions, defense counsel may have reasonably chosen not to request them. (Cf. *People v. Slaughter* (2002) 27 Cal.4th 1187, 1222.) And, any error in failing to instruct on defense of habitation was not prejudicial. (See Discussion § III.B.2., *ante*.)

17.

Finally, defendant claims trial counsel should have requested a limiting instruction regarding the evidence of defendant's altercation with Richard. Defense counsel may have reasonably concluded the risk of a limiting instruction outweighed its benefit. (See *People v. Hawkins* (1995) 10 Cal.4th 920, 942, abrogated on other grounds by *People v. Lasko* (2000) 23 Cal.4th 101.) Specifically, counsel may have wished to draw as little attention to the evidence as possible. We cannot say "there simply could be no satisfactory explanation" for defense counsel's conduct. (*People v. Mai*, *supra*, 57 Cal.4th at p. 1009.)

We therefore reject defendant's claims of ineffective assistance of counsel.

**DISPOSITION**

The judgment is affirmed.

_____
Poochigian, J.

WE CONCUR:


_____
Gomes, Acting P.J.


_____
Franson, J.

18.