Filed 12/19/22  P. v. Diaz CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D079583 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCE383751) |
| JOSE ANGEL DIAZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Robert O. Amador, Judge.  Affirmed.

Athena Shudde, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Steve Oetting and Michael Dolida, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Jose Angel Diaz of five counts of committing lewd acts on a child under Penal Code[1] section 288, subdivision (a) involving substantial sexual conduct within the meaning of section 1203.066, subdivision (a)(8). Thereafter, the trial court sentenced Diaz to 30 years to life under the One Strike law (§ 667.61). The convictions stemmed from Diaz's molestation of his granddaughter when she was eight and nine years old, and molestation of his own daughter around the same ages.

On appeal, Diaz challenges the admission of hearsay statements that were used to impeach two character witnesses that testified on his behalf. Diaz also asserts that his sentence constitutes cruel or unusual punishment in violation of the California Constitution. We reject both of Diaz's challenges and affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

When she was 14 years old, Diaz's granddaughter, N.D., came forward with allegations that Diaz abused her. The summer before she entered ninth grade, N.D. told her cousin that Diaz, her paternal grandfather, had molested her as a young child. A few months later N.D. told a close friend about the abuse. Later in the school year, N.D. told another friend, who urged N.D. to tell her parents.

At the encouragement of her friend, in March 2018, N.D. eventually wrote a letter to her mother disclosing the abuse by Diaz. She gave the letter to her mom before school and told her not to read it until she was at work. Once there, N.D.'s mother read the letter and then immediately called her husband's sister, C.D. N.D.'s mother knew C.D. was abused as a child, but she did not know who the perpetrator was. Without disclosing N.D.'s letter to

---

[1] Subsequent undesignated statutory references are to the Penal Code.

2

C.D., N.D.'s mother asked C.D. if her abuser was Diaz. C.D. confirmed Diaz molested her as a child.

N.D.'s mother then called her husband and told him about N.D.'s letter. Both parents left work and N.D.'s mother took N.D. out of school. The three met at home to discuss the letter. N.D. was emotional and scared to hurt her father. N.D. told her parents about the abuse and then they took her to a nearby sheriff's station. After reporting the abuse to the sheriff, N.D.'s mother called Diaz's brother, M.D., and his wife, E.D, and told them about the allegations. M.D. and E.D. came to the family's house to support N.D. and her parents.

Later that evening, after M.D. and E.D. had left, N.D.'s mother called Diaz to confront him about the abuse. N.D.'s father and older brother were with N.D.'s mother and she put Diaz on speakerphone. At first, Diaz denied the abuse. Eventually, however, he admitted that he had molested N.D., stating "I only touched her, I didn't hurt her, I only touched her." When N.D.'s mother asked Diaz why he did it, he said, "because I was crazy." Both N.D.'s father and her older brother testified that they heard Diaz's admission. N.D.'s parents told Diaz he should turn himself into the police, and he did so the following day.

Diaz was eventually charged with five counts of committing a lewd act on a child, in violation of section 288, subdivision (a), with all charges involving substantial sexual conduct within the meaning of section 1203.066, subdivision (a)(8). The first two counts, which pertained to N.D., included a multiple victim enhancement allegation under the One Strike law, section 667.61, subdivisions (b), (c), and (e). The other three counts, which pertained to C.D., were alleged to comply with the requirements of the statute of limitations exception set forth in section 803, subdivision (f).

At trial, N.D., then 17, testified about the abuse perpetrated by Diaz.[2] She told the jury that when she was eight and nine years old, Diaz lived with her family in a two-bedroom apartment in Ramona. N.D.'s parents shared one bedroom, N.D. slept in the second bedroom, and N.D.'s two brothers, one younger and one older, slept in the living room with Diaz. Occasionally, N.D. would sleep with the boys and Diaz in the living room, typically when she got tired watching television and fell asleep there.

One night when N.D. was eight years old, she was in the living room watching television with Diaz and her younger brother. N.D. was on the floor in the middle of the room, and Diaz was sitting away from her near the kitchen. N.D. fell asleep, and, when she woke up, Diaz was holding her upper arm and pulling her close to him. In Spanish, Diaz told N.D. not to tell her mother, and then he unbuttoned her pants, put his hand inside of her underwear, and touched the outside of her vagina. When Diaz was done, he again told N.D. not to tell anyone.

N.D. testified that at the time of the abuse, she did not understand that what Diaz had done was wrong, she had no sexual experience to frame what had occurred. She pushed the incident out of her mind and tried to act like it never happened.

N.D. also testified about a second incident of abuse. She recalled that when she was nine years old, she again fell asleep on the living room floor watching television. Diaz was sitting on the couch away from N.D. This time when N.D. woke up, Diaz was on the ground behind her with his arm under her head and his hand covering her mouth. As he had before, Diaz told N.D. not to say anything and then reached down into her pajamas. Diaz put his

<hr />

[2]    This appeal is from the second jury trial on the allegations. The first trial ended in a mistrial after the jury deadlocked on all counts.

hand inside N.D.'s underwear and touched her vagina the same way he had done the first time with his hand "going around in circles." Diaz stopped when N.D. got up and left the room.

N.D. did not tell anyone what had happened because she did not want to cause problems for her family. She did not want to tell her parents about it because she felt guilty and ashamed. Instead, N.D. tried to ignore it and act as if nothing had ever happened. N.D. testified that she eventually told her cousin about the abuse after he shared a similar experience.

Once Diaz turned himself in, C.D. came forward with allegations of abuse that she suffered as a child. At trial, C.D. testified that when she was seven to nine years old, Diaz frequently touched her in her "private areas." C.D. explained that during this time frame, whenever she went into the living room and laid down on the couch in front of Diaz, he would use his hand to rub her vagina on the outside of her clothing.

Diaz's defense at trial consisted of his own testimony and the testimony of several character witnesses, who told the jury Diaz was not capable of the charged crimes. The character witnesses, including M.D. and E.D., told the jury Diaz was a truthful and honest person; a peaceful nonthreatening person; a good person with children; and a person, who as an adult, has not been sexually attracted to young girls or minors. When he took the stand, Diaz denied ever inappropriately touching either N.D. or C.D.

After hearing the court's instructions and the parties' closing statements, the jury returned a guilty verdict on all five counts and true findings on all of the enhancement allegations. At the subsequent sentencing hearing, the court imposed an indeterminate sentence of 30 years to life in prison. That term consisted of two consecutive 15-years-to-life terms on counts 1 and 2 under the One Strike law. The court also imposed a

5

concurrent determinate term of 10 years, consisting of six years for count 3 and two two-year terms for counts 4 and 5. Diaz filed a timely notice of appeal.

DISCUSSION

I

Diaz first challenges the introduction of hearsay statements made by M.D. and E.D., which were admitted as prior inconsistent statements of these two character witnesses. Diaz characterizes the evidence as improper lay opinion testimony concerning his guilt that should have been excluded by the court. The Attorney General responds that the statements were properly admitted to impeach M.D.'s and E.D.'s testimony that they did not believe N.D. and that Diaz was not sexually attracted to minor girls.

A

*Additional Background*

During trial, after the prosecution presented its case in chief, Diaz's counsel asked to clarify an issue that arose in the first trial concerning hearsay statements by M.D. and E.D. Defense counsel explained that during the earlier trial, the prosecutor asked these witnesses if, on the day they went to N.D.'s home after she had disclosed the abuse to her mother, they told N.D.'s parents they believed N.D.'s allegations because Diaz had molested his younger sister when she was a child.

Diaz's counsel argued that the prosecutor could not elicit this hearsay testimony because in response to the prosecutor's questions at the first trial, M.D. and E.D. denied making such statements, therefore the prosecutor no longer had a good faith belief that the witnesses would testify to this fact. Defense counsel also argued that the statements were false, irrelevant, and, even if relevant, that they should be excluded as unduly prejudicial under

6

Evidence Code section 352. The trial court denied the request to preemptively preclude the testimony. The court ruled that if M.D. and E.D. testified they did not think Diaz was capable of the alleged abuse of N.D. and C.D., the hearsay statements would be admissible as prior inconsistent statements.

The following day, Diaz's trial counsel informed the court she intended to call several character witnesses to provide their opinions on whether Diaz is a truthful and honest person, whether he is peaceful or threatening, and whether as an adult he is known to be sexually attracted to minor girls. The prosecutor did not object to the character witness evidence proffered. The court then again asked the prosecutor about the hearsay statements by M.D. and E.D. The prosecutor explained that N.D.'s mother stated that M.D. and E.D. made the statements to her the day N.D. disclosed the abuse to her. The prosecutor told the court that she did not intend to cross-examine M.D. and E.D. about those comments. The court then repeated its earlier ruling, stating that if M.D. and E.D. testified that their opinion was that Diaz was not capable of the present crimes, their hearsay statements to N.D.'s mother would be admissible as prior inconsistent statements.

On direct examination, E.D. testified that she knew Diaz as truthful, honest, peaceful, and good with children. She also stated she did not know Diaz to be sexually attracted to minor girls. Defense counsel asked E.D. about her interaction with N.D.'s family the day N.D. disclosed the abuse to her mother. E.D. stated only that she was at the family's home a short time and saw N.D.'s parents drinking, which she said they did frequently. On cross-examination, the prosecutor asked E.D. if she went to N.D.'s family home because she believed the allegations that N.D.'s mother told her. She responded that she and her husband went because "when they have a

7

problem we always go." E.D. also testified that Diaz had a good relationship with N.D.'s parents until N.D.'s accusations emerged, and that the accusations did not change her opinions about Diaz.

During his direct examination, M.D. testified that he believed Diaz was good with children and a peaceful person, and he did not believe Diaz was sexually attracted to young girls. M.D. then testified about the visit to N.D.'s family home on the day N.D. disclosed the abuse to her mother. He stated that when he arrived there with his wife, N.D.'s parents were drinking. M.D. testified he went there to discuss the accusations in the case, and stated he told N.D.'s parents they should investigate and prosecute Diaz. M.D. then stated, "but I didn't believe them because they were saying it pretty calmly because if someone touched one of my children I would be worried, but they were calm like nothing happened." Defense counsel then ended her direct examination with M.D.'s testimony that he did not believe C.D. was an honest person.

On cross-examination, the prosecutor asked M.D. if he initially believed N.D.'s parents and M.D. denied that he had ever believed them. The prosecutor then requested a sidebar conversation outside the presence of the jury. During the sidebar, the trial court confirmed its prior ruling that M.D. could be impeached with his alleged statement to N.D.'s mother that he believed the allegations because Diaz had tried to molest his younger sister. The prosecutor then attempted to impeach M.D.:

> Q: You just testified a moment ago that you didn't believe [N.D's parents] when they told you what happened; correct?
>
> A: Of course.
>
> Q: But that day isn't it true that you told [N.D.'s parents] that you believed them?

A: No.

Q: And isn't it true that you told [N.D's parents] that you believed them because you believe he had done this in the past, or tried to –

A: No.

Q: – tried to – tried to touch your sister … inappropriately?

A: No.

On rebuttal, the prosecution recalled N.D.'s mother to the stand to ask her about the conversation with M.D. and E.D. N.D.'s mother testified that when she told M.D. and E.D. about N.D.'s allegations, they both indicated they believed N.D. because Diaz had also tried to molest his younger sister. She stated that "[t]hey both were very shocked, but they both had told me that [Diaz] had tried to do something to their younger sister in the past, so they believed it." The prosecutor then asked N.D.'s mother, "[a]nd obviously you don't know the truth of those accusations, correct?" She responded, "I don't." Last, N.D.'s mother testified that if M.D. said that he never believed N.D.'s accusations, that was not consistent with his statement to her and that both M.D. and E.D. told her the same story about Diaz and his younger sister.

During further cross-examination, N.D.'s mother stated that she believed M.D. to be dishonest. N.D.'s mother also told the jury that she did not believe E.D. to be dishonest, but that if E.D. testified that she never disclosed the information about Diaz trying to abuse his sister that was untruthful.

9

B

*Legal Standards & Analysis*

" ' " 'Only relevant evidence is admissible [citations], and all relevant evidence is admissible unless excluded under the federal or California Constitution or by statute. [Citations.] Relevant evidence is defined in Evidence Code section 210 as evidence "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." The test of relevance is whether the evidence tends " 'logically, naturally, and by reasonable inference' to establish material facts …. [Citations.]" [Citation.] The trial court has broad discretion in determining the relevance of evidence ….' " ' " (*People v. Richardson* (2008) 43 Cal.4th 959, 1000–1001, as modified (July 16, 2008).)

Additionally, trial courts have "a traditional and intrinsic power to exercise discretion to control the admission of evidence in the interests of orderly procedure and the avoidance of prejudice." (*People v. Hall* (1986) 41 Cal.3d 826, 834.) Specifically, " '[u]nder Evidence Code section 352, the trial court enjoys broad discretion in assessing whether the probative value of particular evidence is outweighed by concerns of undue prejudice, confusion or consumption of time.' " (*People v. Lewis* (2001) 26 Cal.4th 334, 374.) A court's ruling in this regard is "reviewed under an abuse of discretion standard, and a trial court's determination 'will not be overturned on appeal in the absence of a clear abuse of that discretion, upon a showing that the trial court's decision was palpably arbitrary, capricious, or patently absurd, and resulted in injury sufficiently grave as to amount to a miscarriage of justice.' " (*People v. Lamb* (2006) 136 Cal.App.4th 575, 582; Evid. Code, §§ 353, subd. (b), and 354.)

Hearsay is an out-of-court statement "offered to prove the truth of the matter stated." (Evid. Code, § 1200, subd. (a).) It is inadmissible as a matter of state evidence law unless the statement falls within an exception to the hearsay rule. (*Id.*, subd. (b); see *People v. Sanchez* (2016) 63 Cal.4th 665, 674.) The hearsay rule "is rooted in concerns about reliability." (*In re I.C.* (2018) 4 Cal.5th 869, 884.) Thus, a statement qualifies as hearsay only when its reliability is at issue because "the proponent seeks to rely on the statement to prove that assertion is true." (*Sanchez* at p. 674.)

Evidence Code section 1235, however, creates an exception to the hearsay rule for a witness's prior inconsistent statements. The provision states, "Evidence of a statement made by a witness is not made inadmissible by the hearsay rule if the statement is inconsistent with his testimony at the hearing and is offered in compliance with Section 770." Evidence Code section 770 in turn provides that prior inconsistent statements may be admitted if (1) "[t]he witness was so examined while testifying as to give him an opportunity to explain or to deny the statement; or" (2) "[t]he witness has not been excused from giving further testimony in the action." Put simply, the introduction of prior inconsistent statements is permitted despite the hearsay rule if the speaker has the opportunity to explain or deny the statement from the witness stand. (Evid. Code, §§ 1235, 770.)

In addition, a prior inconsistent statement is "admissible both as impeachment and for its truth." (*People v. Rices* (2017) 4 Cal.5th 49, 85.) The court, however, has discretion to limit the jury's use of a prior inconsistent statement for impeachment purposes only. (*People v. Osorio* (2008) 165 Cal.App.4th 603, 618.)

11

C

*Analysis*

Here, Diaz attempts to show reversable error by characterizing the hearsay statements at issue as an improper legal opinion about Diaz's guilt, which he contends the prosecution relied on for its truth. This is not an accurate representation of the evidence. Rather, the hearsay statements at issue—statements from M.D. and E.D. to N.D.'s mother that they believed N.D. because of earlier misconduct by Diaz—were properly admitted to impeach M.D.'s and E.D.'s testimony that (1) they never believed N.D.'s allegations and (2) Diaz was not sexually interested in young girls.

Contrary to Diaz's assertion, M.D.'s and E.D.'s testimony as to whether they believed N.D. was first elicited by Diaz's counsel, not the prosecutor. Likewise, Diaz's counsel elicited these witnesses' opinions that they did not think Diaz had a sexual interest in young girls. Only after this line of questioning by defense counsel did the prosecutor question M.D. about his prior inconsistent statements in accordance with Evidence Code sections 770 and 1235.[3] This was a proper introduction of M.D.'s and E.D.'s hearsay statements to N.D.'s mother.

We also reject Diaz's assertion that the court should have excluded the evidence as unduly prejudicial under Evidence Code section 352. He argues that the reference to an additional molestation "allowed the jury to speculate

[3] In the argument portion of his brief, Diaz leaves out an important portion of M.D.'s trial testimony. He asserts that "in response to defense counsel's inquiry as to what occurred during the meeting with [N.D.'s parents, M.D.] said 'they should investigate if there was anything,' but his personal feeling, at the time, was that [N.D.'s parents] were too calm under the circumstances." This summary, however, omits M.D.'s trial testimony that he "didn't believe" N.D.'s allegations because her parents seemed too calm.

as to the nature of the molestation and, worse, to speculate that appellant had had an unnatural or abnormal sexual interest in young girls in his family since he was a young man ... [which] predisposed the jurors against appellant based upon a wholly unproved act ...."  This bare assertion, however, does not show that the evidence was so inflammatory that its inclusion was unduly prejudicial.

Importantly, the court and the prosecutor made clear that the evidence was admissible as a prior inconsistent statement for purposes of impeaching M.D. and E.D.'s trial testimony; not to show that Diaz had molested his sister in the past.  Specifically, after eliciting the hearsay statements, the prosecutor asked N.D.'s mother, "obviously you don't know the truth of those accusations, correct?"  N.D.'s mother confirmed that she did not know whether the allegations concerning Diaz's sister were true.

Thereafter, the jury was given instructions that emphasized the limited admissibility of the hearsay statements.  First, the jury was given CALCRIM No. 351, "Cross Examination of Character Witnesses," which specifically explained how the jurors should consider the questions by the prosecution and the testimony from the witnesses regarding M.D.'s and E.D.'s hearsay statements: "The attorney for the People was allowed to ask defendant's character witnesses if they had heard or said that the defendant engaged in certain conduct.  These 'have you heard' or 'have you said' questions and their answers are not evidence that the defendant engaged in any such conduct.  You must consider these questions and answers only to evaluate the meaning and importance of the character witness's testimony."

Further, the jury was instructed with CALCRIM No. 222, which states "Nothing that the attorneys say is evidence.  ...  Their questions are not evidence.  Only the witnesses' answers are evidence.  The attorneys'

13

questions are significant only if they helped you to understand the witnesses' answers. Do not assume that something is true just because one of the attorneys asked a question that suggested it was true." These instructions underscored the limited use of the hearsay evidence, minimizing its prejudicial effect. (See e.g., *People v. McNally* (2015) 236 Cal.App.4th 1419, 1429 [" 'It is only in the exceptional case that "the improper subject matter is of such a character that its effect ... cannot be removed by the court's admonitions." ' "].)

In sum, the admission of M.D.'s and E.D.'s prior inconsistent statements was proper and Diaz has not shown the court abused its considerable discretion under Evidence Code section 352 by allowing the evidence.

## II

Diaz next argues the imposition of a prison term of 30 years to life constitutes a violation of his right against cruel or unusual punishment under the California Constitution. The Attorney General responds that the punishment is constitutional under the relevant test set forth in *In re Lynch* (1972) 8 Cal.3d 410 (*Lynch*). As we explain, we agree with the Attorney General.

## A

### *Legal Standards*

Diaz was sentenced in accordance with the One Strike law (§ 667.61). The law increases the penalties imposed on defendants who commit certain sexual offenses under specified circumstances. (Sen. Bill. No. 26, Stats. 1993-1994, ch. 14, § 1.) Here, the law required the imposition of sentences of 15-years to life for counts 1 and 2, and further required the sentences to run consecutively. Diaz identifies no error in this calculation. Rather, he asserts

14

the imposition of the required sentence violates his right against cruel or unusual punishment contained in the California Constitution.

The Eighth Amendment to the United States Constitution prohibits cruel and unusual punishment. Our state Constitution, by contrast, prohibits cruel *or* unusual punishment. (Cal. Const., art. I, § 17; *People v. Baker* (2018) 20 Cal.App.5th 711, 723 (*Baker*).) Because this difference in wording is purposeful, this Court applies the state provision separately from the federal one. (*Baker*, at p. 723.)

Whether a sentence is cruel and/or unusual is a question of law for the appellate court, but the underlying disputed facts are viewed in the light most favorable to the trial court. (*People v. Martinez* (1999) 76 Cal.App.4th 489, 496.) Reviewing courts also "give substantial deference both to the Legislature's broad authority to determine the parameters for the punishments for crimes, and to the trial court's discretion in imposing specific sentences." (*People v. Gomez* (2018) 30 Cal.App.5th 493, 499 (*Gomez*).) A punishment is cruel or unusual under the California Constitution "if, although not cruel or unusual in its method, it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity." (*Lynch, supra*, 8 Cal.3d at p. 424.) In reviewing an indeterminate sentence, "it is the maximum term prescribed by the statute—not a lesser period thereafter fixed as an 'incentive to well-doing'—which must survive constitutional scrutiny." (*Id*. at pp. 416–417.) Therefore, we must consider whether Diaz's life sentence withstands constitutional scrutiny. (*Baker, supra*, 20 Cal.App.5th at p. 723.)

*Lynch* described three factors to determine whether a sentence constitutes cruel or unusual punishment: (1) "the nature of the offense and/or the offender, with particular regard to the degree of danger both

15

present to society;" (2) a comparison of the sentence to "punishments prescribed in the same jurisdiction for different offenses which, by the same test, must be deemed more serious;" and (3) a comparison of the sentence "with the punishments prescribed for the same offense in other jurisdictions having an identical or similar constitutional provision." (*Lynch, supra*, 8 Cal.3d at pp. 425–427, italics omitted.) "The weight afforded to each prong may vary by case" (*Baker, supra*, 20 Cal.App.5th at p. 723), and "[d]isproportionality need not be established in all three areas." (*People v. Norman* (2003) 109 Cal.App.4th 221, 230.)

B

*Analysis*

Diaz argues that under the first and second *Lynch* factors the sentence he received constitutes cruel or unusual punishment. Although we agree that the punishment imposed in this case is severe, it does not rise to an unconstitutional level.

In assessing the nature of the offense and the offender, we consider the offense not only in the abstract, but also "the totality of the circumstances surrounding the commission of the offense in the case at bar, including such factors as its motive, the way it was committed, the extent of the defendant's involvement, and the consequences of [defendant's] acts." (*People v. Dillon* (1983) 34 Cal.3d 441, 479.) We also "evaluate whether the punishment fits the criminal." (*Baker, supra*, 20 Cal.App.5th at p. 724, italics omitted.) This task focuses "on the particular person before the court, [asking] whether the punishment is grossly disproportionate to the defendant's individual culpability as shown by such factors as his age, prior criminality, personal characteristics, and state of mind." (*Dillon*, at p. 479.)

16

As the Attorney General argues, Diaz's molestation of his daughter and granddaughter when they were seven to nine years of age are shocking crimes.  And our state has "a strong public policy to protect children of tender years."  (*People v. Olsen* (1984) 36 Cal.3d 638, 646.)  "[S]exual abuse of a child is a most serious crime and an act repugnant to the moral instincts of a decent people."  (*Ashcroft v. Free Speech Coalition* (2002) 535 U.S. 234, 244.)  Diaz was convicted of multiple instances of molesting N.D and C.D.  He touched his daughter's and his granddaughter's vaginas at ages where they were too young to understand what was happening.  As the court noted at the sentencing hearing, the testimony of the victims established the molestation stopped only when the victims became old enough to comprehend that what Diaz was doing to them was wrong.

The crimes here were calculated, premeditated, and predatory, and were committed against particularly vulnerable victims who looked to Diaz to protect them.  Diaz's criminal conduct stemmed from his abuse of a position of trust.  These sexual assaults were not the result of confusion, an impaired mental state, miscommunication, or another possibly mitigating circumstance.  Rather, the crimes were intentional acts in which Diaz inflicted great harm on children entrusted to his care.  (See *People v. Christensen* (2014) 229 Cal.App.4th 781, 806 ["lewd conduct on a child may not be the most grave of all offenses, but its seriousness is considerable.  It may have lifelong consequences to the well-being of the child"].)

Diaz argues his case should be distinguished from *Baker* because the crime in that case was more serious.  The defendant in *Baker* was the 50-year-old uncle of his six-year-old victim.  While visiting the victim's family, the defendant brought the victim into bed with him, rubbed her stomach, pulled down her underwear, touched her vagina, orally copulated her, and

17

kissed her mouth. (*Baker, supra*, 20 Cal.App.5th at pp. 716–717, 725.) This court held that the indeterminate 15-years-to-life sentence imposed against the defendant for oral copulation of a victim under the age of 10 was not cruel or unusual. (*Id*. at p. 715, 719–732.) The defendant, like Diaz, did not have a prior history of sexual crimes. The court concluded this fact was insufficient to support his claim of cruel and unusual punishment. (*Id*. at p. 725.)

*Baker* noted the defendant perpetrated three unprovoked sexual acts against the victim during the encounter, did not stop the molestation immediately, ignored the victim's protestations, and was a mature adult in " 'complete control of the situation.' " (*Baker, supra*, 20 Cal.App.5th at p. 725.) The facts in this case are arguably more severe than those in *Baker*. Here, Diaz abused his granddaughter twice and his own daughter multiple times. Each of the multiple encounters was entirely unprovoked and Diaz was in complete control of the situations. We agree with the Attorney General that *Baker* supports the conclusion that the sentence imposed in this case is not cruel or unusual.

Diaz next contends his sentence is disproportionate when compared to the punishments imposed for "more serious offenses" under California's laws. Specifically, he points to the fact that the One Strike law does not apply to three other severe crimes, the rape of child under the age of 14 when the child is incapable of resisting due to intoxication (§§ 261, subd. (a)(3), 264, subd. (a)), sodomy committed when the victim is intoxicated or the perpetrator threatens arrest or deportation (§§ 286, subds. (f)(1) & (k), 667.71, subd. (c)), and assault of minor with intent to commit rape, sodomy, oral copulation, or sexual penetration (§ 220, subd. (a)(2)). Diaz also argues his sentence is disproportionate because the One Strike law requires the same sentence for the more serious crimes of rape, sexual penetration,

18

sodomy, and oral copulation committed by means of force or violence (§ 667.61, subd. (c)).

Diaz's comparisons, however, are inadequate. The sentences he references for these crimes are for a single offense, not the sentences that would be imposed in cases, like this one, involving multiple offenses. In *Baker*, the court upheld the imposition of a sentence of 15 years to life for a single act of oral copulation of a child under 10 years old. (*Baker, supra*, 20 Cal.App.5th at pp. 727–730; see *Gomez, supra*, 30 Cal.App.5th at p. 502 [upholding sentence of 15-years to life for one conviction of sexual penetration of child under age 10 years old].) Diaz was convicted of five discrete and separate sex crimes against two victims, who were both very young, vulnerable members of his own family.

Further, "[i]t is well within the prerogative of the Legislature to determine that sex offenses against young children are deserving of longer sentences than sex offenses against adults or non-sex offenses. ' "Punishment is not cruel or unusual merely because the Legislature may have chosen to permit a lesser punishment for another crime. Leniency as to one charge does not transform a reasonable punishment into one that is cruel or unusual." ' " (*Gomez, supra*, 30 Cal.App.5th at p. 502.) Critically here, we must pay great deference "to legislation designed to protect children, who all too frequently are helpless victims of sexual offenses." (*Baker, supra*, 20 Cal.App.5th at p. 729.) Diaz has not shown that the imposition of a sentence

of 30 years to life shocks the conscience and we reject his claim that it constitutes cruel or unusual punishment.[4]

DISPOSITION

The judgment is affirmed.


McCONNELL, P. J.

WE CONCUR:


DO, J.


BUCHANAN, J.

---

[4]     Diaz does not argue that the third *Lynch* factor, which looks to the "punishments prescribed for the same offense in other jurisdictions having an identical or similar constitutional provision," supports his claim. Accordingly, we do not undertake an analysis of this factor.  (*Lynch, supra,* 8 Cal.3d at p. 427, italics omitted.)